[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 22, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13677

_____

D. C. Docket No. 04-01082-CV-TWT-1

OPTIMUM TECHNOLOGIES, INC.,

Plaintiff-Appellant,

versus

HENKEL CONSUMER ADHESIVES, INC.,
HENKEL CORPORATION,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 22, 2007)**

Before EDMONDSON, Chief Judge, and BIRCH and WILSON, Circuit Judges.

BIRCH, Circuit Judge:

In this appeal, plaintiff Optimum Technologies, Inc. ("Optimum") raises a

number of challenges to the district court's disposition of its action against defendant-appellee Henkel Consumer Adhesives, Inc. ("HCA").[1]  Specifically, Optimum argues that: (1) the district court erred in granting partial summary judgment in favor of HCA on Optimum's claims of trademark infringement and unfair competition; (2) the district court erred in granting summary judgment in favor of HCA on Optimum's claims of breach of confidential relationship, breach of fiduciary duty, fraudulent concealment, fraud, and negligent misrepresentation; and (3) the district court erred in granting --- following a jury trial that resulted in a mistrial --- HCA's renewed motion for judgment as a matter of law on Optimum's trademark and unfair competition claims, due to a lack of evidence establishing Optimum's damages.  Following a careful review of the record and the arguments on appeal, we discern no reversible error by the district court, and, therefore, we **AFFIRM**.

## I.  BACKGROUND

A.  <u>Facts</u>

---

[1] Henkel Corporation, the parent company of HCA, was also named as a defendant in this action and appears as a party in the caption of this appeal.  The district court, however, determined that Henkel Corporation had no involvement in any of the facts alleged in Optimum's complaint.  Accordingly, the court granted summary judgment in favor of Henkel Corporation on all counts that had been lodged against it.  That decision is not challenged by Optimum on appeal, and is therefore deemed waived.  See <u>AT&T Broadband v. Tech Commc'ns, Inc.</u>, 381 F.3d 1309, 1320 n.14 (11th Cir. 2004) ("Issues not raised on appeal are considered abandoned.") (citation omitted).

Optimum is a closely-held family business based in Cartersville, Georgia. The company sells a number of flooring and carpeting-type products in both the commercial and home consumer markets. Its best selling home consumer product is the "Lok-Lift Rug Gripper," a two-sided adhesive product that can be applied in strips to the backs of rugs and mats to secure them in place and prevent slippage on various surfaces. Beginning in the 1980s, Optimum began selling the Lok-Lift product to home improvement retailers like Home Depot, Lowe's, and Ace Hardware. Since 1981, Optimum has had a federally registered trademark in the mark "Lok-Lift," when used in connection with the sale of a "Serim Material to Be Interposed Between Carpet and Surface to Anchor Carpet in Place." R1-1, Exh. 1.[2]

HCA distributes a number of consumer goods, including adhesive tapes, to large home improvement retailers. In some cases, HCA manufactures its own home improvement products; in other cases its products are supplied by outside manufacturers. In the latter scenario, HCA typically obtains its products from third party manufacturers, and then sells and distributes them directly to those retailers with whom HCA has existing relationships.

_____

[2] Optimum's product is known as the "Lok-Lift Rug Gripper," but its registered mark is limited to the phrase "Lok-Lift." For purposes of this opinion, we will refer to Optimum's product as "the Lok-Lift product," but in discussing the registered trademark we will use the registered mark, "Lok-Lift."

In 1993, HCA approached Optimum[3] and expressed an interest in entering into a distributor relationship with Optimum, one centered on Optimum's flagship Lok-Lift product. The relationship with Optimum would permit HCA to establish a greater presence in the floor and rug departments of retailers such as Home Depot and Lowe's --- retailers with whom Optimum already had pre-existing accounts. In turn, the distributorship would allow Optimum to leverage HCA's existing relationships with some larger retailers that Optimum had been seeking to sell the Lok-Lift product to, such as Wal-Mart and K-Mart. Under the terms of the parties' arrangement --- which was based on a "handshake" and was not reduced to writing --- Optimum would manufacture and supply the Lok-Lift product to HCA, and HCA would assume responsibility for marketing and distributing the Lok-Lift product to retailers.

Pursuant to this arrangement, Optimum turned over a number of its large retail accounts to HCA, including the contact information for those retailers, product pricing information, customer information, and sales figures. As to these accounts, which included Home Depot and Lowe's, HCA obtained the exclusive right, going forward, to sell and distribute the Lok-Lift product. Lewis P.

---

[3] Optimum's initial business dealings were with HCA's predecessor corporation, Manco, Inc. ("Manco"). In 1997, however, Henkel Corporation, HCA's parent company, purchased a majority interest in Manco, and in 2002 Manco formally changed its name to "HCA." For ease of reference, throughout this opinion we refer to the defendant-appellee as "HCA."

McDermott, Chief Executive Officer of Optimum, testified that the accounts it assigned to HCA constituted the vast majority of Optimum's major retail accounts.

Prior to selling the Lok-Lift product, Optimum and HCA worked together in designing the product's external packaging. This packaging consisted of a green box, a photo of a hand lifting a rug, a picture of a roll of tape, the phrase "Lok-Lift Rug Gripper," and, in the corner of the packaging, the corporate logo of HCA's predecessor corporation. It is undisputed that HCA was permitted to use the "Lok-Lift" trademark during the term of the parties' distributor relationship.

HCA began distributing the Lok-Lift product to retailers in early 1994. HCA would place orders for the Lok-Lift product with Optimum by filing a purchase order. Optimum would ship the product to HCA --- in the packaging agreed to by the parties --- and HCA would then sell and distribute the product to retailers. The early years of this business relationship were, by all accounts, uneventful.

Within a few years, however, HCA had begun internally developing its own adhesive carpet tape product, which it hoped would eventually replace Optimum's Lok-Lift product. HCA began internally marketing and testing a foam-backed latex rug product --- which was eventually named "Hold-It For Rugs"--- as early as

1998.[4]  From the period 1998 to 2002, however, while this change was being contemplated internally at HCA, HCA continued to purchase the Lok-Lift product from Optimum and to distribute the Lok-Lift product to retailers.

Optimum was not made aware of HCA's plans to change products. Commencing in 2001, HCA advised Optimum that it was contemplating a "packaging change" to the Lok-Lift product's box.  R-88 at 142-43; R-127 at 201-202.  In early 2002, as HCA was preparing to roll out the Hold-It product to retail stores, HCA informed Optimum that it would be "mak[ing] changes in the Lok-Lift Rug Gripper packaging," and that, as a result, Optimum was "not to order more [Lok-Lift product] packaging without [HCA's] okay."  R1-1, Exh 10.

In the fall of 2002, HCA sent a memorandum --- to which Optimum was not privy --- to all of its large retailers, including Home Depot, Lowe's, and Ace Hardware.  The HCA memorandum stated that HCA was preparing to introduce a new "rug gripper product" to its retailers, and that it would no longer be selling the "old version."  Br. of Appellee at 18-19; R-128 at 209.  It did not mention the Hold-It product by name, mentioning only a new "rug gripper product." Id.  The memorandum also advised its retailers that HCA's new rug gripper product would

[4] HCA later obtained a trademark in the mark "Hold-It."  For purposes of this opinion, HCA's product, "Hold-It For Rugs," is referred to throughout the opinion as "the Hold-It product," whereas HCA's trademark is referred to by the federally registered mark, "Hold-It."

be superior in terms of quality.

HCA used the same UPC code, bar code, and item number as the Lok-Lift product on the new Hold-It product. HCA also used a similar packaging design for its Hold-It product. Specifically, the new Hold-It product consisted of a green box, a photo of a hand lifting a rug, a picture of a roll of tape, and the phrase "Hold-It For Rugs." The Hold-It product packaging was the same size as the Lok-Lift product, and the products' packages contained the same quantities of adhesive tape. Unbeknownst to Optimum, HCA began shipping its Hold-It product to retail stores sometime in late December 2002.

On 17 January 2003, Sean McDermott, who is a vice president of sales in the commercial division at Optimum discovered the Hold-It product on the shelf at a Lowe's store while on a personal errand. Subsequently, HCA's strategic sourcing manager, Mike Jupina, informed Optimum that the company had "decided to take a new direction with [its] business" and that it would no longer be ordering the Lok-Lift product from Optimum. R1-1, Exh. 11. HCA confirmed this decision in a written letter to Optimum, which was written by Jupina. The relationship between the companies was terminated shortly thereafter. The Hold-It For Rugs product is now sold at a number of the retailers that were once selling the Lok-Lift product, including Home Depot, Lowe's, and Ace Hardware.

Pertinent to the present action, in the wake of the termination of the parties' relationship --- and HCA's decision to replace the Lok-Lift product with Hold-It at all of its retail accounts --- some co-mingling of the two products occurred on the shelves of HCA's retailers. For example, Ronald Matheny, a Home Depot representative who was responsible for liaising with vendor representatives at Home Depot stores throughout the Southeast, testified that he had received complaints that the new Hold-It product was being sold on Home Depot's shelves "with the 'Lok-Lift' name on the tag underneath." R-312 at 71-72; see also Optimum Techs., Inc. v. The Home Depot USA, Inc., No. 1:04 CV 3260, 2005 WL 3307508, at *1 (N.D. Ga. Dec. 5, 2005) (stating that "Home Depot displayed Hold-It For Rugs on shelves labeled Lok-Lift Rug Gripper"). Optimum's Sean McDermott testified that he personally saw the Hold-It product on a store shelf at a Home Depot on Sidney Marcus Boulevard in Atlanta, Georgia, with signage for the Lok-Lift product sitting underneath the product.[5] There have also been reports that Hold-It product sat in "Lok-Lift"-labeled display cases on retail store shelves. Randolph Lear, vice president of HCA's Do-It-Yourself business division, has stated that when product substitutions like these are effectuated by HCA, there is

---

[5] See also R-88 at 34-35 (testimony of Stephen Davis, vice president for sales and marketing at Optimum, stating that he had received reports that some Home Depot stores in the Georgia area continued selling Hold-It with Lok-Lift signage underneath the product).

some potential for the old product to be co-mingled with the new product on the retailers' shelves. HCA has effectively conceded that, in some instances, "the 'Lok-Lift Rug Gripper' name remained on shelf tags . . . for some time after sales of the Hold-It For Rugs product began." Br. of Appellee at 24. In addition, it is alleged that, for a period after the Hold-It product had replaced the Lok-Lift product, a person purchasing Hold-It at some Home Depot stores would have the purchase indicated on the printed Home Depot store receipt as "Lok-Lift."

Some of HCA's retailers were allegedly unaware of HCA's product change; Optimum has asserted that some store representatives stated that they thought they were still ordering the Lok-Lift product, when in actuality they were ordering the Hold-It product. A representative of Home Depot in Denver, Colorado stated to Sean McDermott that she had been under the impression that the products were essentially the same. Lewis J. McDermott, the company's founder, testified that, in his discussions with his buyer-contacts at a number of retailers, many of them had made clear that they thought the two rug products were identical.

In addition, even after the parties' relationship had been terminated, some of HCA's own websites apparently continued to contain references to the Lok-Lift product. Evidence was presented that HCA's websites contained pictures of the Hold-It product next to a product description of the Lok-Lift product. On some of

HCA's websites, if a customer were to search for a local retailer who was selling the Lok-Lift product, they might be directed to a retailer who was actually selling the Hold-It product.

In April 2004 Optimum filed the present action in the Northern District of Georgia, alleging nine counts against HCA, including: trademark infringement, in violation 15 U.S.C. § 1114(1); unfair competition and trade dress infringement, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair trade practices, in violation of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372(a); breach of confidential relationship; breach of fiduciary duty; fraudulent concealment; fraud; and negligent misrepresentation.

B.  The District Court Proceedings

1.  District Court's Summary Judgment Order

In January 2005, HCA moved for summary judgment on all counts.  The district court disposed of HCA's motion in a detailed Opinion and Order.  First, with respect to Optimum's action for federal trademark infringement under 15 U.S.C. § 1114(1), the district court evaluated Optimum's claim that HCA had infringed its registered mark "Lok-Lift" via its alleged conduct.  The court determined that, even if Optimum had a colorable claim of trademark infringement based on the co-mingling and mislabeling of the Lok-Lift mark and the Hold-It

10

product on retail store shelves, those "alleged infringing uses [were] only attributable to the retailers, not HCA." R-170 at 7. Specifically, the court found that there was "no evidence that HCA was responsible for generating the Home Depot pricing stickers or shelving labels, which referred to the Hold-It For Rugs product as Lok-Lift Rug Gripper, or for placing the allegedly infringing stickers on the shelves." Id. at 8. Because there was no evidence that the alleged infringements at the retail level were attributable to HCA, the court concluded that Optimum's action for trademark infringement–based on the alleged mislabeling and co-mingling of the Lok-Lift mark and the Hold-It product in retail stores–would not lie.

The court found, however, that there was some evidence that HCA had continued to use the "Lok-Lift" mark on the company's website, even after the parties' distribution relationship had terminated. Specifically, the court found that HCA's website had continued to "feature[] a picture of the Hold-It For Rugs product" with a description of the Lok-Lift product, and that the website had used the product search feature to guide potential purchasers of the Lok-Lift product to retailers of the Hold-It product. Id. at 9. Finding this to be evidence of an unauthorized "use" of the mark on HCA's website for trademark law purposes, the court then turned to the question of whether that use was "likely to cause

11

confusion, or to cause mistake or to deceive." See Burger King Corp. v. Mason, 710 F.2d 1480, 1491 (11th Cir. 1983). The court concluded that the "Lok-Lift" mark was strong; that the products were similar and served similar functions; and that HCA's use of the mark on the website could arguably result in customer confusion. In light of these determinations, the court concluded that Optimum had presented "sufficient evidence to create a genuine issue of fact as to whether HCA's use of the Lok-Lift mark on its web sites created a likelihood of confusion." R-170 at 17.

The district court found, however, that HCA's alleged unauthorized "use" of the "Lok-Lift" mark --- if any --- had only occurred on the Internet sites. As a result, the court held that there was insufficient evidence to support a broader trademark infringement action against HCA based upon allegations of confusion at the retail level. It thus granted partial summary judgment to HCA on Optimum's trademark infringement claim. The court's order made clear that, at trial, Optimum's trademark action would be limited to the issue of "HCA's use of the Lok-Lift mark on its web sites." Id. at 29.

Turning to Optimum's claims for unfair competition under both section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372(a), the district court concluded that the

12

same analysis would apply as that which was used in limiting Optimum's trademark infringement claim. Because the same analysis that governs a trademark infringement also applies to claims brought under 15 U.S.C. § 1125(a) and O.C.G.A. § 10-1-372(a), the court concluded that genuine issues of material fact remained as to HCA's conduct vis-à-vis its website. The court reiterated, however, that there was insufficient record evidence to support claims of unfair competition against HCA at the level of the retail stores. Thus it granted partial summary judgment to HCA on these claims.[6]

Turning to Optimum's remaining claims, the district court concluded that HCA was entitled to summary judgment on Optimum's claims of breach of confidential relationship, breach of fiduciary duty, and fraudulent concealment. The court concluded that there was neither a confidential relationship nor a fiduciary relationship between the parties, but that the arrangement had been a typical manufacturer-distributor relationship, one that was terminable at will by either party. In addition, because there was no legally cognizable confidential relationship between the parties, the court concluded that HCA had no duty to

---

[6] The court also dismissed Optimum's count for trade dress infringement under § 1125(a), based on the court's finding that the overall packaging of the Lok-Lift product was neither inherently distinctive, nor did it have secondary meaning. That aspect of the district court's holding is not challenged on appeal, and therefore, we do not address it. See AT&T, 381 F.3d at 1320 n.14 (citation omitted).

13

disclose its plans to replace the Lok-Lift product with the Hold-It product, and, accordingly, a claim for fraudulent concealment would not lie.

As to the claims for fraud and negligent misrepresentation, the district court found that both causes of action required a showing that the defendant had made a false representation, but that Optimum had failed to demonstrate how HCA's alleged representation --- namely, the statement to Optimum that it would be making a "packaging change" to the Lok-Lift product's package --- was false. Id. at 40. Moreover, the court found that, even assuming the statement was false, there was no showing that Optimum had proximately suffered damage in reliance on the statement–in fact, the court concluded that Optimum had arguably avoided unnecessary cost by reducing its packaging inventory for the Lok-Lift product as instructed. Thus, the court granted summary judgment in favor of Optimum on these claims.

2. Post-Trial Judgment as a Matter of Law in Favor of HCA

In the wake of the summary judgment order, Optimum proceeded to a jury trial on its remaining claims of trademark infringement and unfair competition. In accordance with the district court's summary judgment order, Optimum's case at trial was limited to the issue of HCA's conduct on its websites, and whether that conduct constituted either a trademark infringement or unfair competition.

14

Optimum was precluded from introducing any evidence as to confusion at the level of the retailers; as the court explained to the jury in an early limiting instruction, "[t]he one single claim that I have allowed to go forward in this case is the alleged trademark infringement that arose as a result of the defendant's use of the Lok-Lift mark on its website. That is the only claim that you will be allowed to consider in this case." R-12 at 116-117.

Optimum's witnesses at trial were likewise limited in their testimony as to whether HCA misused the Lok-Lift mark in the context of its website; they were not permitted to mention any allegations of misconduct at the retail level. See, e.g., id. at 132, 134, 135 (testimony of Lewis P. McDermott limited to allegations of HCA misconduct with respect to the website); see also id. at 154 (limiting witness testimony to the question of "whether or not the use of the Lok-Lift trademark on the defendant's website in the year 2003 was likely to cause consumer confusion"); id. at 163-64 (testimony of Steven Davis limited to use of the Lok-Lift mark on HCA's website); R-13 at 239 (testimony of Ronald Matheny of Home Depot, same); id. at 296 (testimony of Sean McDermott, same).

In addition, the trial testimony of Optimum's damages expert was limited to the question of how much of his damage estimate --- a figure of $7.6 million, which had been set forth in his pre-trial report --- was actually attributable to

15

HCA's conduct on the website. During his cross-examination, Optimum's expert was questioned about why his damages report failed to specifically mention HCA's website, or to discuss the use of the Lok-Lift mark in the context of the Internet. The expert eventually conceded that his damage report had been general in nature, that it had been prepared prior to the court's summary judgment ruling, and that, consequently, it had failed to "separate out" those damages that were attributable to HCA's conduct on the website. R-14 at 581.

Optimum's jury trial lasted four days. After a period of deliberations, the jury indicated in a note to the court that it was "unable to reach a unanimous verdict regarding damages." R-16 at 678. Consequently, the court declared a mistrial. Post-trial, HCA made a renewed motion for judgment as a matter of law, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, having moved for it previously at the close of Optimum's case-in-chief and again at the close of all of the evidence.

The district court granted HCA's renewed motion for judgment as a matter of law, and dismissed Optimum's remaining claims for trademark infringement and unfair competition. Specifically, the court found that Optimum's expert testimony should not have been admitted in the first place, as the evidence had failed to establish a connection between the conduct at issue (HCA's use of the

16

mark on the website) and the claimed damages ($7.6 million). The court found that there was "no legally sufficient evidentiary basis for a reasonable jury to find for Optimum on the issue of damages," and awarded judgment as a matter of law to HCA. R-287 at 13. Optimum appeals, challenging both the court's summary judgment order as well as its post-trial order granting HCA judgment as a matter of law.

## II. DISCUSSION

A.   Appeal of the District Court's Summary Judgment Order

We first address the district court's summary judgment order. We review a district court's grant of summary judgment de novo, applying the same legal standard used by the district court. See Johnson v. Bd. of Regents, 263 F.3d 1234, 1242 (11th Cir. 2001) (citation omitted). Under that standard, summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this assessment, we review all facts and inferences in a light most favorable to the nonmoving party --- in this case, Optimum. Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999) (citation omitted). We have held that "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the

17

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Johnson, 263 F.3d at 1243 (quotations and citation omitted).

### 1. Optimum's Count of Trademark Infringement

Optimum first appeals the district court's grant of partial summary judgment in favor of HCA on its trademark infringement claim. On appeal, Optimum contends that the court's decision was in error. Specifically, it argues that it presented sufficient evidence to withstand summary judgment on this claim based on the misconduct in the retail stores.

Trademark infringement is proscribed by 15 U.S.C. § 1114(1)(a), which prohibits any person from the "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." In order to prevail on a trademark infringement claim based on a federally registered mark, "the registrant must show that (1) its mark was used in commerce by the defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive." See Burger King, 710 F.2d at 1491. The parties do not dispute that Optimum's

18

"Lok-Lift" mark is a federally registered mark that is entitled to protection. Thus we must address: (1) whether Optimum presented sufficient evidence of an unauthorized "use" of the mark by HCA at the retail level; and (2) if so, whether the evidence was sufficient to create a genuine issue of material fact as to a likelihood of confusion at the retail level.

The first step of a trademark infringement action is to demonstrate an unauthorized "use" of the plaintiff's mark in commerce. Id.; see also SunAmerica Corp. v. Sun Life Assurance Co. of Canada, 77 F.3d 1325, 1343-44 (11th Cir. 1996) (stating that the "starting point" of a Lanham Act claim is that the plaintiff had enforceable rights in the mark and that the defendants engaged in a "use" of the mark). In order for a mark to be "use[d] in commerce" the mark must be "placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto." See 15 U.S.C. § 1127. If such an unauthorized "use" is shown by the plaintiff, the first prong of a trademark infringement action has been satisfied. See 15 U.S.C. § 1114(1)(a); Burger King, 710 F.2d at 1491.

In addressing Optimum's trademark infringement claim, the district court concluded that, even if the co-mingling of the Lok-Lift mark with Hold-It product on the retailer shelves constituted an unauthorized "use," the evidence was not

19

sufficient to allege a claim for trademark infringement *directly* against HCA based on these "uses," because "the[] alleged infringing uses [were] only attributable to the retailers, not [to] HCA." R-170 at 7. The court did not assess whether the incidents of confusion at the retail level were sufficient to create an issue of fact as to a "likelihood of confusion" for purposes of a trademark action. Rather, it stated that, even assuming there was evidence of a likelihood of confusion, there was "no evidence that HCA was responsible" for the alleged misuse of Optimum's registered mark, that is, "generating the Home Depot pricing stickers or shelving labels" or "placing the allegedly infringing stickers on the shelves." Id. at 8.; id. at 16 (finding no evidence that "HCA used the Lok-Lift mark in its in-store advertising," and finding that "the only allegation of an infringing use of the mark attributable to HCA occurred on the Internet"). Since, the court found, HCA had not been responsible for any of the allegedly unlawful "uses" of the mark at the retail level, the court granted partial summary judgment to HCA with respect to the alleged misconduct at the retail stores.[7]

Our review of the record demonstrates that Optimum presented evidence that

_____

[7] As noted, the court *did* find that Optimum had presented "sufficient evidence to create a genuine issue of fact as to whether HCA's use of the Lok-Lift mark on its web sites created a likelihood of confusion." R-170 at 17. Accordingly, the court denied summary judgment to HCA on Optimum's trademark claim with respect to HCA's uses of the mark --- after the parties' relationship had ended --- on its website. That aspect of the court's summary judgment order is not before us on appeal.

20

some of the *retail outlets* engaged in unauthorized "uses" of the Lok-Lift mark, in that the Lok-Lift mark continued to appear on retail shelf tags and shelf crates containing the Hold-It product. Additionally, some retail store receipts allegedly indicated that the product the customer had received was the Lok-Lift product, when, in fact, the customer had bought the Hold-It product. Once the Hold-It product replaced the Lok-Lift product in the retail outlets, any continued "place[ment]" of the Lok-Lift mark on "goods" or "displays" at the level of the retail stores --- in connection with the sale of any product other than Optimum's Lok-Lift product --- arguably constituted an unauthorized "use in commerce" of Optimum's Lok-Lift mark. See 15 U.S.C. § 1127; see Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250, 1252 (9th Cir. 1982) (stating, where a defendant-restaurant gave store customers Coca-Cola when they asked for Pepsi, and indicated on store receipts that its customers were getting "Coke" when they were in fact getting "Pepsi," that "[t]aken alone, such conduct . . . appears to present a clear-cut case of trademark infringement"). Thus the parties' dispute does not center on whether the mark "Lok-Lift" was "used" in commerce, at the level of the retail stores, without Optimum's permission.

Rather, the pivotal question for us on appeal is whether these alleged unauthorized "uses" of the mark at the retail level should be attributable to

21

defendant-appellee HCA, as the distributor of both the Lok-Lift and Hold-It products. Optimum argues that it has presented sufficient evidence to establish that HCA "used" its Lok-Lift mark at the retail level, without its consent, and that it should be held liable for trademark infringement. 15 U.S.C. § 1114(1)(a). It contends that, taken together, there was sufficient evidence from which a jury could conclude that HCA was responsible for the "place[ment]" of the Lok-Lift mark on "goods" or "displays" at the retail level, and that it can be held liable as a result. See 15 U.S.C. § 1127. Specifically, Optimum argues that HCA designed the Hold-It product, including its UPC code and its product identification number (both of which were identical to Lok-Lift's); that HCA distributed the Hold-It product to retailers, such as Home Depot, without sufficiently advising them that it was a different product; that HCA provided the underlying product information that these retailers relied upon to generate the shelf tags, product descriptions, and product labels inside their stores; and that HCA was responsible for ensuring that its products were properly labeled and identified, and were not erroneously intermingled, on the retail store shelves.

In response, HCA argues that the district court was correct in concluding that the infringements at the retail level --- if any --- were not attributable to HCA. It contends that "[HCA] did not have control over retailers' databases, such as at

22

Home Depot, and [] could not itself print a shelf tag to apply in Home Depot retail stores." Br. of Appellee at 24; see also id. at 37. HCA refers us to the court's finding, in its summary judgment order, that "there is no evidence that HCA was responsible for generating the Home Depot pricing stickers or shelving labels . . . or for placing the allegedly infringing stickers on the shelves." R-170 at 8.

In this case, we find, as the district court did, that the evidence produced by Optimum was insufficient to establish that HCA "used" its Lok-Lift mark at the level of the retailers, such that it could be held directly liable for a trademark infringement. While there is some evidence that the replacement of the Lok-Lift product with the Hold-It product at retail stores may have resulted in confusion, in at least some retail stores, and while that confusion may have resulted in the unintentional co-mingling and mislabeling of the Hold-It product with the Lok-Lift mark on some store shelves, there is no evidence that *HCA* itself "misused" the Lok-Lift mark, that is, that it "placed" the Lok-Lift mark on "goods" or "displays" at the level of the retail stores. See 15 U.S.C. § 1127.

On the contrary, the evidence makes clear that HCA ceased its "use in commerce" of the Lok-Lift mark when it made the switch over to the Hold-It product and began selling the Hold-It product to retail stores. There is *no evidence* that HCA ever sold its Hold-It product with the Lok-Lift mark affixed to it, or that

23

HCA identified its product as anything other than Hold-It at the retail level. See, e.g., R-86 at 66 (testimony of Sean McDermott that he had no evidence that the Hold-It product was sold with the Lok-Lift mark on it); R-87 at 197-98 (testimony of Vickie McDermott that she never saw the Hold-It product being sold with the Lok-Lift mark on it); R-95 at 136-37 (testimony of Lewis J. McDermott, same).

In fact, HCA advised its retailers, prior to the implementation of the new Hold-It product that it would be switching over to a new "rug gripper product" to its retailers, and that it would no longer be selling the "old version." Br. of Appellee at 18-19; R-128 at 209. HCA's Randolph Lear testified that he made it clear to HCA's sales force that the Lok-Lift product would no longer be available after HCA transitioned to the Hold-It product, and that they were to advise their customers of this fact. A letter written by HCA to Home Depot informed the company that HCA would be rolling out a "new technology for rugs and mats" known as the Hold-It product, and that this product would be "replacing our current Rug Gripper" product. R-310 at 65.

In short, Optimum has failed to present sufficient evidence that HCA was responsible for the alleged "misuses" of the Lok-Lift mark at the level of the retail stores, evidence that it was required to submit in order to withstand summary

24

judgment on its trademark infringement claim.[8] The district court acted properly in concluding that there was insufficient evidence of a "use" of the Lok-Lift mark at the retail level that would support a claim for direct trademark infringement against HCA.

Optimum suggests in its appeal that the district court should have permitted it to proceed to trial on a claim of contributory trademark infringement, as an alternative grounds for liability. We have long recognized that a distributor in the chain of commerce, such as HCA, may be held contributorily liable for a direct trademark infringement by a merchant to whom it distributes a product, where there is evidence that the distributor "intentionally induce[d] [the merchant] to infringe another's trademark or . . . knowingly participated in a scheme of trademark infringement." See Mini Maid Servs. Co. v. Maid Brigade Sys., Inc., 967 F.2d 1516, 1522 (11th Cir. 1992) (adopting the contributory trademark liability standard of Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853-54, 102 S. Ct. 2182, 2188 (1982)); see also Bauer Lamp Co., Inc. v. Shaffer, 941 F.2d

---

[8] While Optimum does present evidence that the Hold-It product appeared in stores above tags bearing the Lok-Lift mark, and that Hold-It products sat on retail shelves in display cases erroneously denoted with the Lok-Lift mark, it fails to present any evidence that HCA either placed the Lok-Lift mark on the store shelving, or that it placed the Hold-It product in Lok-Lift display cases. As the district court found, "there is no evidence that HCA was responsible for generating the Home Depot pricing stickers or shelving labels . . . or for placing the allegedly infringing stickers on the shelves." R-170 at 8. The alleged misuses of the Lok-Lift mark, if any, are attributable to the retail stores, but not to HCA.

25

1165, 1171 (11th Cir. 1991) ("A person who knowingly participates in furthering the [] infringement is liable as a contributing party."). Optimum contends that it presented evidence that its mark was directly infringed at the level of the retail stores–a contention, as we noted earlier, that does not appear to be disputed by the parties here–and that it presented evidence that HCA "knowingly participated" in that infringement by its conduct. See Mini Maid, 967 F.2d at 1522. Optimum suggests that HCA's conduct --- in using the same UPC code and product identification number as the Lok-Lift product, in providing all of the relevant product information to the retailers, in failing to advise retail stores to update their systems to reflect the new Hold-It product, and in visiting stores to observe product displays --- establishes that HCA was a "knowing participant" in the infringement at the level of the retail stores, such that it should be held contributorily liable for the trademark infringements of the retailers. Under this theory, HCA knowingly contributed to the co-mingling at the retail level --- in which Hold-It products appeared above shelf tags bearing the Lok-Lift mark, and Hold-It products sat on retail store shelves in display cases denoted with the Lok-Lift mark --- and, as a result, it should be held secondarily responsible for those acts.

There are problems with this theory in this case, however. First, as the district court noted, Optimum failed to properly plead a claim for contributory

26

trademark infringement; its complaint is devoid of any mention of holding HCA contributorily --- as opposed to directly --- liable for the alleged infringements of Optimum's Lok-Lift mark. In fact, Optimum's complaint makes clear that its trademark infringement claim is based on *HCA*'s alleged "misuse" of the mark, not the retailers'. See R-1 at 34 ("Henkel has used Optimum's trademarks without authorization . . . . "); id. ("Henkel has used the Lok-Lift Rug Gripper trademarks without the authorization of Optimum. . . . Henkel's activities constitute trademark infringement . . . ."); id. ("Henkel's infringement is wilful . . . ."). Optimum's complaint does not allege that HCA was a "knowing participant" in the separate, direct infringements at the retail level; rather, the complaint clearly is based on alleged direct infringements, by HCA, of the Lok-Lift mark. Thus, to permit Optimum to now pursue a trademark infringement claim based on a contributory liability theory would require us to convert what is plainly a direct trademark infringement claim into one for contributory infringement. This is a step we are loath to take, and one for which there appears to be no authority in our circuit. Indeed, Optimum can refer us only to a district court opinion, from a different circuit, in support of the proposition that a court may alternatively construe a claim alleging a "violat[ion of] § 1114(1)" as a claim for contributory trademark infringement --- and address that claim on the merits --- when such a claim has not

27

been explicitly pled. See Nat'l Fed'n of the Blind, Inc. v. Loompanics Enters., Inc., 936 F. Supp. 1232, 1243-44 (D. Md. 1996).

Moreover, although there is no separate statutory provision for contributory trademark infringement, and although both actions stem from the general prohibitory language of 15 U.S.C. § 1114(1), the case law suggests that a contributory infringement claim requires, at a minimum, both an allegation of a direct infringement by a third party, and an allegation of an intentional or knowing contribution to that infringement by the defendant. See, e.g., Inwood, 456 U.S. at 850, 102 S. Ct. at 2186 (stating that Ives "allege[d] that the [manufacturers] *contributed* to the infringing activities of pharmacists who mislabeled [generic drugs]") (emphasis added); Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc., 747 F.2d 844, 849 (3d Cir. 1984) (stating that the alleged violation "derived from allegations that [the defendants] manufacture and distribution of [] capsules identical to [the plaintiff's] capsules, *with reasonable anticipation or the intent that they would be illegally substituted* for [the plaintiff's] capsules, would constitute contributory trademark infringement") (emphasis added). To be sure, a number of Lanham Act cases suggest that contributory trademark infringement is typically alleged as a separate count. See, e.g., Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 983 (9th Cir. 1999) (where plaintiff alleged one claim for contributory

28

infringement and a separate claim for direct infringement); Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 261 (9th Cir. 1996) (where the count for contributory trademark infringement was specifically alleged).

We decline Optimum's invitation to construe its case as one for contributory trademark infringement, where the elements in support of such a claim have not been pled. The Tenth Circuit declined a similar opportunity. See Procter & Gamble Co. v. Haugen, 317 F.3d 1121, 1128-29 (10th Cir. 2003) (where the plaintiff never used the phrase "contributory infringement," and where the plaintiff only stated that the defendant "implied[ly] approv[ed]" of the infringing acts, stating that the court was "reluctant to adopt [such a] broad definition of notice pleading so as to include a claim for contributory infringement"). Similar to the Tenth Circuit, we conclude that, absent some allegation of a "contribution" to a direct trademark infringement or of a "knowing participation" in a direct trademark infringement, Mini Maid, 967 F.2d at 1522, we will not construe a claim for direct trademark infringement under 15 U.S.C. § 1114(1) as being one for contributory trademark infringement.[9]

---

[9] Moreover, even were we to permit Optimum to proceed on a contributory trademark infringement claim against HCA, based on the incidents at the retail stores, such a claim would still be highly problematic. This is so because a claim of contributory infringement against HCA would require a preliminary finding of a *direct* infringement, presumably by the retailers who mislabeled the Hold-It product with the Lok-Lift mark. See, e.g., Procter & Gamble, 317 F.3d at 1128 (a contributory trademark infringement action requires the defendant's knowledge of a direct infringement); AT&T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1432 (3d

29

Finally, we note that there is no evidence in the record of Optimum's

"knowing participation" in the alleged direct infringements of the Lok-Lift mark at

the retail level–evidence that would be necessary to sustain a claim based on a

theory of contributory trademark infringement. On the contrary, as we observed

earlier, HCA warned its retail partners in advance that it would be replacing the

Lok-Lift product with the Hold-It Product and that it would be discontinuing its

sale of the former. R-128 at 209; R-310 at 65. Moreover, when there were

occasional instances of co-mingling at the level of the retail stores, HCA worked to

ensure that the problem was rectified and that Hold-It was no longer labeled on

store shelves with the Lok-Lift mark. See R-312 at 85, 91 (testimony of Home

Depot's Eric Demaree that HCA worked to ensure that any labeling problems were

fixed at its 1,500 retail stores). The record is devoid of evidence of a "knowing

Cir. 1994) (same). Here, however, Optimum would have us simultaneously find that the retail stores, such as Home Depot, directly infringed (and that HCA contributed to those infringements), while also finding that it was the retail stores that suffered confusion for purposes of a trademark infringement analysis. See Br. of Appellant at 29-30 (stating, as evidence of actual confusion, that sales associates in retail stores expressed confusion about the products; that retail stores used the Lok-Lift mark to identify the Hold-It product at the point of sale, suggesting that they were confused; and that the retailers "use[d] 'Lok-Lift' on shelf tags and receipts . . . in retail stores," thereby evincing actual confusion). Optimum cites to no authority --- from this or any other circuit --- suggesting that an entity can be both a direct infringer of a trademark and the party that suffers the injury of confusion from that infringement. In other words, we fail to see how the retail stores could simultaneously have directly infringed on the Lok-Lift mark (which would perforce be a requirement of a contributory infringement claim against HCA) *while also* being the ones who suffered actual confusion from the alleged infringement. This internal inconsistency further militates against permitting Optimum's claim of contributory infringement to go forward.

participation" on the part of HCA in the alleged direct infringements at the retail level, evidence that would be necessary for Optimum to withstand summary judgment on a claim of contributory trademark infringement.

For these reasons, we conclude that the district court acted properly in declining to address a separate claim of contributory trademark infringement against HCA. Because such a claim was not pled by Optimum, the district court was not required to address such a claim in ruling on HCA's summary judgment motion.

In summary, in reviewing Optimum's trademark infringement action against HCA based on the incidents in the retail stores, we conclude that Optimum failed to satisfy the first prong of a trademark infringement claim --- that is, an unauthorized "use" of the mark by HCA at the retail level. Because Optimum failed to present sufficient evidence to support the "use" requirement of a trademark infringement action, we need not address the second step of the analysis, that is, whether the alleged misconduct at the retail stores (if any) was "likely to cause confusion, or to cause mistake or to deceive." See Burger King, 710 F.2d at 1491; cf. Alliance Metals, Inc. of Atlanta v. Hinely Indus., Inc., 222 F.3d 895, 907 (11th Cir. 2000) (applying the likelihood of confusion analysis); Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999) (same). Any

31

alleged confusion in this case, even if present, was not directly attributable to HCA, the alleged infringer. Since Optimum's claim for trademark infringement --- predicated on the co-mingling on retail shelves --- fails on the "use" prong, we do not undertake the "likelihood of confusion" analysis. We agree with the district court that HCA was entitled to partial summary judgment on Optimum's trademark infringement claim, based on the incidents at the retail stores.

## 2. Optimum's Count of Unfair Competition

Optimum also appeals the district court's grant of partial summary judgment on its claims of unfair competition and unfair trade practices. Optimum brought an unfair competition claim against HCA under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Optimum also lodged a claim under Georgia's analogous state law, the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372(a). The district court granted summary judgment in favor of HCA on both of these counts, at least with respect to the alleged incidents of confusion at the level of the retail stores.[10] Optimum contends that this was in error.

Section 43(a) of the Lanham Act creates a "federal cause of action for unfair competition." Univ. of Fla. v. KPB, Inc., 89 F.3d 773, 775 (11th Cir. 1996) (per

_____

[10] As with the trademark claim, the court permitted Optimum to proceed on its claims of unfair competition based on HCA's alleged conduct on its websites, but it otherwise granted partial summary judgment for HCA.

curiam) (citation omitted). The pertinent statutory provision prohibits the "use[] in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a)(1)(A). Section 43(a)'s general purpose is to "protect persons engaged in commerce against unfair competition." See Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28, 123 S. Ct. 2041, 2045 (2003) (citing 15 U.S.C. § 1127) (alterations omitted). More germane to the present action, however, section 43(a)'s language --- which prohibits a "false designation of origin"--- has been construed by the courts as creating a federal action for "passing off," which occurs "when a producer misrepresents his own goods or services as someone else's." Id. at 28 n.1, 123 S. Ct. at 2045 n.1; Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1310 (11th Cir. 2007).

In this case, Optimum contends that HCA "pass[ed] off its Hold-It Product as if it were Optimum's Lok-Lift Product or associated with Optimum," that is, that it "substitut[ed] its product for that of another while misrepresenting the source of that product to the buyer." Br. of Appellant at 40. Consequently,

33

Optimum argues that it has a viable section 43(a) claim against HCA based on the product substitution at the level of the retail stores, and that the district court erred in granting partial summary judgement for HCA on this claim.

We disagree. The Supreme Court has made clear that, in the context of a "passing off" / "false designation of origin" claim under section 43(a), the use of the word "origin" refers to a false or misleading suggestion as to "the producer of the tangible goods that are offered for sale." Dastar, 539 U.S. at 37, 123 S. Ct. at 2050. In other words, a passing off claim requires a showing that the defendant falsely represented that the plaintiff was the "source" of the goods when it was not, that is, that it falsely suggested that the plaintiff was "the producer of the tangible product sold in the marketplace." Id. at 31, 123 S. Ct. at 2047.

Here, there is no evidence that HCA substituted its Hold-It product on store shelves while suggesting that Hold-It's source was Optimum (the manufacturer of the Lok-Lift product). In fact, the record is bereft of any evidence that HCA ever represented Hold-It as being manufactured by anyone other than HCA. Because HCA did not "misrepresent[] [its] own goods or services as [being] someone else's," *i.e.* Optimum's, and because HCA did not falsely suggest that Optimum was "the producer of the [Hold-It product] sold in the marketplace," Optimum has failed to allege evidence to support a claim of "passing off" at the level of the retail

34

stores.  See id. at 28 n.1, 31, 123 S. Ct. at 2045 n.1, 2047.  As a result, the district

court acted properly in granting partial summary judgment on Optimum's section

43(a) claim.[11]

3.  Optimum's Counts of Breach of Confidentiality, Breach of Fiduciary
Duty, and Fraudulent Concealment

Optimum also appeals the district court's grant of summary judgment on its

claims of breach of confidentiality and breach of fiduciary duty, and fraudulent

concealment.  The district court granted summary judgment in favor of HCA on

these three counts, based on its conclusion that the parties were not in a

confidential or a fiduciary relationship, and, therefore (failing a contractual

requirement) there was no legally imposed duty that HCA disclose to Optimum the

fact that it was replacing the Lok-Lift product with the Hold-It product.

Where two parties enter into a confidential relationship, Georgia law will

impose a duty on the parties to disclose material facts to one another.  See

Williams v. Dresser Indus., Inc., 120 F.3d 1163, 1167 (11th Cir. 1997) (one can be

liable for suppression of material facts under Georgia law only if it is first shown

that there is a relationship creating the duty to disclose).  The burden is on the

---

[11] Because the analysis of a Georgia unfair competition claim is "co-extensive" with the
analysis of a Lanham Act claim, see Step Co. v. Consumer Direct, Inc., 936 F. Supp. 960, 967
(N.D. Ga. 1994), HCA was entitled to partial summary judgment on Optimum's Georgia unfair
competition claim as well.

plaintiff to establish that a confidential relationship existed between the parties to the agreement.  Bogle v. Bragg, 548 S.E.2d 396, 402 (Ga. Ct. App. 2001) (citation omitted).  Generally speaking, "business relationships are not confidential relationships," nor is "[t]he mere fact that one [party] reposes trust and confidence in another's integrity."  Williams, 120 F.3d at 1168.  Rather, in order for a business arrangement between two parties to rise to the level of a confidential relationship, it must be shown either that the parties have a long history with each other, or that the arrangement was not at "arm's length," but was in the nature of a legal partnership or a joint venture.  See id.  A confidential relationship does not arise, however, where the business transaction is merely an arrangement in which each party is "attempting to further [its] own separate business objectives," rather than entering into some sort of joint venture. Id.

Mindful of these limitations, Optimum argues that the manufacturer-distributor relationship between Optimum and HCA was in the nature of a "joint venture," or a legal partnership, and, therefore, that the parties stood in both a confidential and a fiduciary relationship to one another–such that HCA had a legal obligation to disclose its plans with respect to replacing Lok-Lift with Hold-It.  We disagree.  Indeed, there is no evidence that the relationship was anything more than an informal business agreement between a manufacturer and a distributor, one

36

which was terminable at will by the parties. As HCA points out, merely calling the relationship a joint venture or a partnership does not make it so. "Nomenclature is not dispositive," and "whether a partner in a joint venture is a party to a legal partnership depends on the rights and responsibilities assumed by the joint venturers, *i.e.*, a sharing of the fruits and losses with an equal right, expressed or implied, to direct and control the conduct of the enterprise." Jerry Dickerson Presents, Inc. v. Concert / S. Chastain Promotions, 579 S.E.2d 761, 768 (Ga. Ct. App. 2003) (alterations, citations, and internal quotations omitted).

Here, Optimum has not presented any evidence that the parties split the profits of their business endeavor, nor has it established that the parties had an equal right to "control" the putative business enterprise. Rather, the record makes clear that these two parties entered into a standard distributor relationship --- one in which Optimum manufactured and supplied its product and HCA distributed it to retailers. Optimum has not presented sufficient evidence to create a triable issue of fact as to whether the relationship with HCA was in the nature of either a legal partnership or a joint venture, nor is there sufficient evidence to suggest a confidential or fiduciary relationship. "[W]hen the facts do not authorize a finding of a confidential relationship, the trial court does not err in deciding the issue as a matter of law." Williams, 120 F.3d at 1168. Accordingly, the district court acted

37

properly in granting summary judgment in favor of HCA on Optimum's claims for breach of confidentiality and breach of fiduciary duty. And because one's duty to disclose material facts is only imposed when the parties stand in such a relationship to one another, Bogle, 548 S.E.2d at 401, the district court also acted properly in granting summary judgment for HCA on Optimum's claim of fraudulent concealment.

4. Optimum's Counts of Fraud and Negligent Misrepresentation

Optimum also appeals the district court's grant of summary judgment in favor of HCA on Optimum's claims of fraud and negligent misrepresentation. In order to establish these two claims, a plaintiff must show five elements: (1) that false representations were made; (2) that the defendant knew they were false; (3) that the representations were made either intentionally or negligently; (4) that the plaintiff reasonably relied upon the representations; and (5) that harm proximately resulted from that reliance. Williams, 120 F.3d at 1167 (fraud); MacIntyre & Edwards, Inc. v. Rich, 599 S.E.2d 15, 19 n.14 (Ga. Ct. App. 2004) (negligent misrepresentation).

The district court found that summary judgment was appropriate for HCA on both counts, because Optimum had failed to present any evidence of a false statement on the part of HCA. The court further found that, even assuming that

38

HCA's statement that it was preparing for a packaging change was false, summary judgment would still be appropriate, because there was no evidence that Optimum suffered actual damages as a result its reliance on that statement.  See, e.g., Stiefel v. Schick, 398 S.E.2d 194, 196 (Ga. 1990) (stating that a party "must show that actual damages, not simply nominal damages, flowed from the fraud alleged") (quotations and citation omitted).

We agree that HCA was entitled to summary judgment on Optimum's claims for fraud and negligent misrepresentation, because Optimum has failed to provide evidence that HCA made a false representation to Optimum.  Optimum contends that HCA's statement, in late 2001, that it was contemplating a "packaging change" with respect to the Lok-Lift product --- and that therefore Optimum should abstain from ordering additional packaging inventory --- was materially false.  See R-1, Exh. 10 (stating that HCA would be "planning a packaging change" to the Lok-Lift Rug Gripper packaging, and that, as a result, Optimum was "not to order more [Lok-Lift] packaging without [HCA's] okay"); see also R-88 at 142-43; R-127 at 202.  Optimum asserts that this statement was false because, at the time the statement was made, HCA was in reality contemplating a full-blown substitution of Hold-It for Lok-Lift product, rather than merely a packaging change.

As the district court found, however, Optimum has failed to demonstrate how --- if at all --- the statement that HCA would be making a "packaging change" to the Lok-Lift product was false. In fact, HCA maintains that this statement was actually true; it points out that, in the wake of the Henkel-Manco merger and the name change from Manco to Henkel Consumer Adhesives in 2002, HCA's parent company, Henkel Corporation, was redesigning the packaging for a number of its product lines, including carpet tape. Even if this were not so, HCA's statement to Optimum that it would be changing the packaging of the Lok-Lift product was not false, because HCA did, in fact, change the packaging, tweaking both the design and appearance of the package when it switched to the Hold-It product in late 2002. While Optimum contends that HCA was contemplating more than a mere packaging change --- indeed, it was an outright product replacement --- the factual statement that HCA would, in the future, be changing the design and appearance of the Lok-Lift product's packaging was not false. Because Optimum has failed to present evidence that HCA made a statement that was false,[12] the district court acted properly in concluding that HCA was entitled to summary judgment on Optimum's claims of fraud and negligent misrepresentation.

_____

[12] Nor does HCA's alleged statement to a Home Depot representative that the Lok-Lift product was manufactured by HCA in its Ohio facility support Optimum's claim for fraud. That statement is false, but it was not made to or relied upon by Optimum. Such a statement could feasibly give rise to a cause of action for fraud by Home Depot, but not by Optimum.

B. Appeal of the District Court's Judgment as a Matter of Law in Favor of HCA

Finally, Optimum challenges the district court's decision to grant HCA's renewed motion for judgment as a matter of law, post-trial, on Optimum's trademark infringement and unfair competition claims. We review a district court's ruling on a motion for judgment as a matter of law under Rule 50 de novo, examining the evidence in the light most favorable to the non-moving party --- in this case, Optimum. Doe v. Celebrity Cruises, Inc., 394 F.3d 891, 902 (11th Cir. 2004) (citation omitted).

Here, as discussed above, the trial proceedings were limited to the issue of HCA's conduct on its websites, and whether HCA's conduct on the websites constituted a trademark infringement or unfair competition. Optimum was precluded from introducing any evidence as to the alleged misuses of the Lok-Lift mark and product at the level of the retailers; as the court explained to the jury in an early limiting instruction, "[t]he one single claim that I have allowed to go forward in this case is the alleged trademark infringement that arose as a result of the defendant's use of the Lok-Lift mark on its website. That is the only claim that you will be allowed to consider in this case." R-12 at 116-117. Optimum's trial witnesses were similarly limited in their testimony to the question of whether HCA misused the Lok-Lift mark or the Lok-Lift product in the context of the website;

41

they were not permitted to mention allegations of misconduct at the retail level.

After the jury was unable to reach a verdict on Optimum's trademark and unfair competition claims based on the website conduct, the court declared a mistrial. HCA then renewed its motion for judgment as a matter of law, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. The district court granted the motion, based on its determination that Optimum had failed to establish a connection between the conduct (HCA's use of the mark on the website) and the expert's damages figure ($7.6 million). Because Optimum had failed to produce evidence of "damages caused by the use of the Lok-Lift mark on [HCA]'s web sites," and, accordingly, because there was "no legally sufficient evidentiary basis for a reasonable jury to find for Optimum on the issue of damages," the court awarded judgment as a matter of law to HCA on Optimum's trademark infringement and unfair competition claims. R-287 at 13. Optimum contends that this was in error.

Under Rule 50(b), a party may renew its motion for judgment as a matter of law after the jury has returned its verdict, if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party. See Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001). "Regardless of timing, however, in deciding on a Rule 50 motion a district

court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." Chaney v. City of Orlando, 483 F.3d 1221, 1227 (11th Cir. 2007). That is, "[t]he question before the district court regarding a motion for judgment as a matter of law remains whether the evidence is 'legally sufficient to find for the party on that issue,' regardless of whether the district court's analysis is undertaken before or after submitting the case to the jury." Id. (citing Fed. R. Civ. P. 50(a)(1)); see also Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192 (11th Cir. 2004) (judgment as a matter of law should only be granted "when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue").

As part of its case-in-chief, Optimum was required to establish that HCA's alleged Lanham Act violations proximately caused it to suffer monetary damages. See, e.g., Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1182 (11th Cir. 1994) (stating that a Lanham Act claim requires evidence that the plaintiff "suffered actual damages," that is, that "'the loss was caused by defendants' actions'") (citation omitted); Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 919 (Fed. Cir. 1984) (stating that a Lanham Act claimant must show "tangible, recoverable damages"). Here, Optimum attempted to establish its damages by presenting an expert witness, Daniel Centampo, who testified in

43

support of Optimum's claims. However, in accordance with the court's summary judgment order, Centampo's trial testimony was limited to the question of how much of his damage estimate --- a figure of $7.6 million, which had been set forth in his pre-trial report --- was actually attributable to HCA's conduct on its website.

When pressed in his testimony, Centampo repeatedly stated that his damages report had failed to mention HCA's website, or to discuss the injury that Optimum had suffered from HCA's alleged use of the Lok-Lift mark in the context of the Internet. See R13 at 340, 341, 342, 347, 355; R-14 at 388-89. Eventually, Centampo conceded that his damage report had been general in nature, that it had been prepared prior to the court's summary judgment ruling, and that, consequently, it failed to"separate out" the claimed damages that were actually attributable to HCA's conduct on the website. R-14 at 581. Other than this testimony, Optimum did not present any other evidence to establish its claimed damages.

Upon review, we discern no error in the district court's decision to grant judgment as a matter of law in favor of HCA. As the court observed, Optimum introduced *no* evidence of the actual monetary damages that it suffered from HCA's alleged trademark infringements and unfair competition on the company's website. Consequently, Optimum failed to present "a sufficient evidentiary basis

for the jury to find" that it suffered monetary injury as a result of HCA's alleged misconduct. Cleveland, 369 F.3d at 1194. Because there was "no legally sufficient evidentiary basis for a reasonable jury to find for Optimum on the issue of damages," R-287 at 13, we conclude that the court acted properly in awarding judgment as a matter of law to HCA on Optimum's trademark infringement and unfair competition claims.

### III. CONCLUSION

Optimum has raised a number of challenges to the district court's disposition of its action against HCA, including the arguments that: (1) the district court erred in granting partial summary judgment in favor of HCA on Optimum's claims of trademark infringement and unfair competition; (2) the court erred in granting summary judgment in favor of HCA on Optimum's remaining claims of breach of confidential relationship, breach of fiduciary duty, fraudulent concealment, fraud, and negligent misrepresentation; and (3) the court erred in granting HCA's motion for judgment as a matter of law on Optimum's trademark and unfair competition claims, due to a dearth of evidence establishing Optimum's damages. Having carefully reviewed the record, we **AFFIRM** both the district court's summary judgment order and its order granting judgment as a matter of law.

45