A96A2352. SPEARMAN v. GEORGIA BUILDING AUTHORITY.
(482 SE2d 463)

SMITH, Judge.

In December 1990, Maxie Ann Spearman allegedly slipped and fell in a liquid substance while she was walking between parked vehicles in a parking garage owned by the Georgia Building Author-

ity (GBA). She filed this action against GBA alleging that she suffered injuries as a result of GBA's negligence. The case was tried to a jury, which found in favor of GBA. Spearman appeals, enumerating as error the trial court's charge concerning expert testimony and also the admission of an alleged prior inconsistent statement. We conclude that the court's charge was correct and that admission of the statement was not error, and we affirm.

1. Spearman first complains that the trial court erroneously failed to instruct the jury on the significance of privately published industry standards referred to by expert witnesses. Spearman's requested charge states: "Expert testimony regarding the standard of care is not limited to what may be based upon a published rule or regulation. You may consider expert testimony on this point whenever the witness is shown to be qualified, even if other experts disagree. Expert testimony may incorporate reference to statutes, ordinances, regulations and privately set guidelines, and such may be considered as illustrative of ordinary negligence. However, it is not necessary for there to be a specific violation of a written code or standard in order for there to be a failure to exercise ordinary care."

At trial, expert testimony was in conflict concerning measurement of the coefficient of friction required for safe walking surfaces. Spearman's expert, John Templer, testified that .5 is accepted as a safe coefficient of friction for a concrete walking surface, regardless of whether the surface is wet or dry. On cross-examination, when asked whether a written standard exists for the coefficient of friction on a wet surface, Templer stated that he would "hedge" his reply. He admitted that the national standard for measuring the coefficient of friction is that of the American Society for Testing and Materials (ASTM) and that the ASTM standard "doesn't talk about wet or dry." On the other hand, he also testified, without citing to a specific standard, that ASTM standards do exist for testing wet surfaces in a bathtub.

Four years after Spearman fell, Templer measured the coefficient of friction in the parking garage. He tested two "spots" on the concrete floor in the general area of Spearman's fall. He performed "dry" and "wet" tests of those two areas. When he took measurements on the dry concrete floor at those two spots, Templer found the coefficient of friction to be greater than .5, a measure he considered satisfactory. Upon performing tests on wet concrete, Templer found the coefficient of friction to be greater than .5 at the first spot but between .23 and .28 at the second spot, which was "extremely slick" in his opinion. He performed similar tests on other walking surfaces of the garage and found the coefficient of friction to be less than .5 when tested both dry and wet. He found other "extremely slick" areas in the garage and described them as being comparable to the slick-

ness of glass.

GBA's expert, Daniel Sheehan, testified that he too measured the coefficient of friction of the concrete floor in the general area where Spearman fell. Unlike Templer, who testified that a coefficient of friction of .5 whether measured dry *or* wet is accepted as a safe coefficient of friction, Sheehan testified that the "industry accepted standard is a static coefficient of friction of .5 on a walkway surface tested in a *dry* condition." (Emphasis supplied.) He testified that no standard exists for performing a wet test on a walkway surface. He did admit that the machine he used to measure the surface could yield higher results than the machine used by Templer. Sheehan took several measurements on dry concrete and found no readings below .5.

Spearman maintains that a cautionary jury instruction regarding both "offensive" and "defensive" use of privately published standards is important to protect plaintiffs and defendants from potential abuses of privately promulgated industry standards. She argues that such an instruction "is necessary to avoid having jurors misled into believing that violation of one party's interpretation of a privately promulgated industry standard constitutes negligence as a matter of law, or on the other hand, misled into believing that compliance with another party's interpretation of such a private standard bars tort recovery."

The trial court did not err in refusing to give the requested instruction. Among other requirements, a charge must be adjusted to the evidence and "embody a correct, applicable and complete statement of law, legal and perfect in form." (Citations and punctuation omitted.) *Shilliday v. Dunaway*, 220 Ga. App. 406, 410 (7) (469 SE2d 485) (1996). Spearman's requested charge was not a neutral one that would have instructed the jury on *both* "offensive" and "defensive" use of privately published standards. Instead, the charge would have instructed the jury that violation of private standards could be illustrative of negligence *and* that a violation of the standard of care could be proved even in the absence of such published standards. The requested charge ignores the law in Georgia that "violation of . . . privately set guidelines, although admissible as illustrative of negligence, *does not establish negligence*." (Emphasis supplied.) *Manley v. Gwinnett Place Assoc.*, 216 Ga. App. 379, 380-381 (2) (454 SE2d 577) (1995). See also *Luckie v. Piggly-Wiggly Southern*, 173 Ga. App. 177, 178 (1) (325 SE2d 844) (1984). Because the charge was not a complete statement of the law with regard to privately promulgated guidelines and was not, as suggested by Spearman, one instructing the jury on both the "offensive" and "defensive" use of such guidelines, the trial court did not err in refusing to give it.

In addition, it is incumbent on one alleging error to show that

the error is harmful. See generally *Thompson v. Hardy Chevrolet &c.,* 203 Ga. App. 499, 505 (9) (417 SE2d 358) (1992). Spearman has failed to do this. She maintains that failure to give the charge "allowed a substantial likelihood of juror confusion, leaving the jury with the incorrect impression that ASTM standards would have force of law, and that a walking surface that complies with ASTM standard under dry testing only would necessarily satisfy all requirements of law." We disagree. Spearman's contention is mere speculation. The testimony reveals no significant danger that the jury was confused or could have believed ASTM standards were elevated to having "the force of law." In fact, the testimony reveals otherwise; when asked whether ASTM "sets the law for the State of Georgia," with regard to industry standards, Sheehan answered, "I'm not a lawyer. I don't know that ASTM sets laws anyways." Nor does the testimony reveal that Spearman needed protection from any potential "abuses" of the use of privately promulgated industry standards. If anything, she made extensive use of testimony that the coefficient of friction fell far below those very standards in an effort to convince the jury of GBA's negligence.

The charge as a whole adequately instructed the jury on the role of expert witnesses. In addition to charging on weight of the evidence, credibility, and impeachment, the court charged in relevant part: "The law permits expert witnesses to give their opinions based upon their training and their experience. *You are not required to accept the testimony of any witness, expert or otherwise. Testimony of an expert, like that of all witnesses, is to be given only such weight and credit as you think it's properly entitled to receive.*" (Emphasis supplied.) This charge authorized the jury to accept *or reject* any portion of any expert's testimony, which included testimony regarding the ASTM standards. Consequently, there can be no serious contention that the jury suffered from a misconception that compliance with ASTM standards negated liability.

2. Spearman also contends that the trial court erroneously admitted testimony of an alleged inconsistent prior statement by her expert witness. According to Spearman, a proper foundation was not laid, in violation of OCGA § 24-9-83.

During redirect examination of GBA's expert, Sheehan, GBA elicited testimony that Sheehan had reviewed articles co-authored by Templer. Sheehan was specifically asked, "In those articles, did Dr. Templer himself say there was [sic] no wet test standards?" Spearman objected to this question, contending that GBA did not question Templer about his articles during cross-examination the day before. The trial court overruled the objection, and Sheehan testified that Templer's article addressed the lack of clarity of testing standards. More importantly, he testified that the publication addressed the

"wide variations in wet testing results in trying to recreate them" and that it specifically stated that walkway surfaces are tested in a dry condition.

Spearman contends that GBA failed to lay a foundation prior to using contradictory statements to impeach Templer's testimony. Even assuming this to be so, we find no reversible error. The complained-of line of questioning was elicited by Spearman. Before GBA questioned Sheehan on redirect concerning Templer's publication, Spearman cross-examined Sheehan concerning the existence of an industry standard for performing tests on wet surfaces. During this earlier exchange, Spearman's attorney stated, "Well, we've got a conflict of opinion here between you and Dr. Templer as to what the standard is, so I'm trying to sort this out as the difference between your opinion and his." In response to that statement, Sheehan replied, "I have a paper written by Dr. Templer that states what I'm stating with regards to testing on dry walkway surfaces." Spearman did not object to this reply. Only *after* Spearman's attorney made the comment during cross-examination concerning the difference in opinions of Templer and Sheehan did GBA's counsel follow up on redirect with questions concerning Templer's publication.

We find no reversible error because the complained of testimony was induced by Spearman, and one may not "complain of a judgment, order, or ruling that his own procedure or conduct aided in causing." (Citations and punctuation omitted.) *Shilliday v. Dunaway*, supra, 220 Ga. App. at 410 (6). See also *Crozier v. State*, 263 Ga. 866, 868 (3) (440 SE2d 635) (1994). Also, compounding the fact that Spearman's attorney's *own* comment induced Sheehan's reply and subsequent questions by defense counsel, Spearman's lawyer failed to seek any remedy by, for example, objecting to the reply, moving to strike it, or asking for a curative jury instruction. Instead, he *argued* with Sheehan before moving on to another line of questioning.[1] Although Spearman's counsel objected on redirect to questions concerning Templer's publication, he objected too late. By then, the door was open to GBA's questions. Moreover, Spearman excused Templer after GBA's cross-examination the day before Sheehan testified rather than reserve the right to recall him for further questions. Because Spearman invited inquiry concerning the representations made in Templer's publication and did not attempt immediately to remedy any harm caused by Sheehan's reply during cross-examination, Spearman waived further complaint, either at trial or on appeal. We find no error.

---

[1] Counsel retorted, "Dr. Templer certainly wasn't asked about that the other day, was he?" Following Sheehan's reply that he did not know what Templer was asked in court, Spearman's counsel moved to another line of questioning.

*Judgment affirmed. Andrews, C. J., and Pope, P. J., concur.*

DECIDED FEBRUARY 24, 1997.

Kenneth L. Shigley, for appellant.
Michael J. Bowers, Attorney General, Brent, Woodland, Redic & Sweetnam, Dennis J. Redic, Dennis M. Sweetnam, for appellee.