**KRAFT REINSURANCE IRELAND, LTD., Plaintiff,**

v.

**PALLETS ACQUISITIONS, LLC, d/b/a Atlanta Pallet Company, Defendant.**

**Civil Action No. 1:09–CV–3531–AT.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 2011.

Edwin D. Robb, Todd M. Baiad, Bouhan Williams & Levy, Savannah, GA, for Plaintiff.

Lisa K. Whitfield, William Terrence Casey, Jr., Hicks Casey & Foster, Marietta, GA, for Defendant.

## *ORDER*

AMY TOTENBERG, District Judge.

This action stems from damages the Plaintiff's insured, Kraft Foods International, Inc., incurred after Panamanian port inspectors quarantined and blocked the entry of multiple containers of food products because of mold contamination. Thereafter, all Kraft food products in the containers were destroyed. As the cargo insurer for Kraft Foods International, Inc., Plaintiff seeks to hold Defendant liable for its provision of pallets with an allegedly excessive moisture content based on claims of breach of warranties (Count I) and negligence (Count II). This matter is now before the Court on the Defendant's motion for summary judgment or alternative request for dismissal as a sanction for Plaintiff's alleged spoliation of key evidence. [Doc. 36, 36–1]. For the following reasons, Defendant's motions are **DENIED.**

## I. Summary Judgment Standard

When reviewing a motion for summary judgment, the Court must determine whether "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.,* 496 F.3d 1231, 1241 (11th

Cir.2007) (citing Fed.R.Civ.P. 56(c)). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is warranted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Optimum Techs.*, 496 F.3d at 1241 (11th Cir.2007) (citation omitted). However, a dispute about a material fact is genuine and summary judgment is not warranted if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Court views the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Optimum Techs.*, 496 F.3d at 1241 (11th Cir.2007) (citing Fed.R.Civ.P. 56(c)). The Court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir.1993), *reh'g denied*, 16 F.3d 1233 (11th Cir.1994) (en banc).

## II. Background Facts

Keeping these principles in mind, the Court provides the following statement of facts. This statement does not represent actual findings of fact. *In re Celotex*

*Corp.*, 487 F.3d 1320, 1328 (11th Cir.2007). Instead, the Court provides this statement simply to place the Court's legal analysis in the context of this particular case.

### A. Events Leading to the Legal Dispute

Plaintiff Kraft Reinsurance Ireland, Ltd., ("Kraft Reinsurance") is an insurance company which, among other things, provides cargo insurance to Kraft Foods International, Inc. and Kraft Foods Global, Inc. ("Kraft Foods"), producers and exporters of food products.[1] Defendant Pallets Acquisitions, LLC, d/b/a Atlanta Pallet and Services ("Atlanta Pallet") manufactures and sells wooden pallets for use in shipping products domestically and abroad.

From December 2006 until November 2007, Kraft Foods purchased over one thousand 48″ × 40″ heat-treated[2] hardwood pallets from Atlanta Pallet for use in shipping its products overseas from its Norcross, Georgia distribution center. (Def.'s Statement of Material Facts ("DSMF") ¶ 1, 8, Doc. 36–2; Pl.'s Resp. DSMF ("PRDSMF") ¶ 1, 8, Doc. 42–1). These orders were placed by Derreck Parks, a senior operations supervisor at the Kraft Foods Norcross distribution center. (DSMF ¶ 3, 5, Doc. 36–2; PRDSMF ¶ 3, 5 Doc. 42–1). The orders specified that 48″ × 40″ heat-treated hardwood pallets were to be provided. The orders did

1. Kraft Foods International, Inc. and Kraft Foods Global, Inc. are subsidiaries of Kraft Foods, Inc. For simplicity and because there is no dispute over the ownership of these companies or the authority of their employees, the Court will refer to them collectively as "Kraft Foods." Also for simplicity and clarity reasons, the Court will refer to Kraft Reinsurance primarily as "Plaintiff"

2. International regulations require heat-treated pallets for overseas shipping between trad-

ing partners which have adopted the ISPM15 (International Standards for Phytosanitary Measures) heat-treatment standard. (White Depo. 34, Doc. 36–6). The purpose of ISPM15 heat-treating is to kill insects and nematodes (worms). (*Id.* at 28). As an alternative to heat-treatment, manufacturers can chemically treat their pallets to comply with ISPM15. (Shelton Depo. Ex. 4, Doc. 55–4). ISPM15 does not address moisture or mold growth. (White Depo. 35, Doc. 36–6).

not specifically request air-dried or kiln-dried pallets or pallets having any particular moisture content.[3] (DSMF ¶ 8–9, Doc. 36–2; PRDSMF ¶ 8–9 Doc. 42–1). The evidence is in conflict as to whether or not Kraft Foods specified that the pallets should be made from green or raw wood.[4]

During this time period, Kraft Foods purchased heat-treated pallets exclusively from Atlanta Pallet. (Parks Aff. ¶ 3, Doc. 42–4). To distinguish them from regular white wood pallets also supplied by Atlanta Pallet, Kraft Foods personnel painted a stripe down the middle of the heat-treated pallets. (Parks Depo. 16, Doc. 36–5). Kraft Foods also ordered pallets from CHEP Pallets. (Id. at 14). Pallets supplied by CHEP Pallets were painted blue. Id. at 15. Every heat-treated pallet bears a stamp identifying the kiln where the supplier treated the pallet. (DSMF ¶ 37, Doc. 36–2; PRDSMF ¶ 37, Doc. 42–1). Kraft Foods did not measure the moisture content of the pallets it purchased.[5] (Parks Depo. 20, Doc. 36–5).

During late 2007, Kraft Foods sold food products to Kraft Foods Panama, S.A. (Joint Stipulation ¶ 2, Doc. 60). These products were placed on wooden pallets purchased from Atlanta Pallet, wrapped in plastic, and loaded into freight containers at Kraft Foods' distribution facility in Norcross, Georgia for shipment to Panama.[6] (Parks Aff. ¶ 6, Doc. 42–4; Parks Depo. 12, 22, Doc. 36–5).

The record is unclear as to how long the pallets had been stored at Kraft Foods' facility prior to this shipment, exactly when these containers left Kraft Foods' facility, or how long they remained at sea before arriving in Panama. The record is also unclear as to how long the containers remained at port prior to inspection by Panamanian officials.[7]

---

3. Although Kraft Foods does not specify moisture content, some of Atlanta Pallet's other customers do. (Lewis Depo. 31, Doc. 56).

4. Parks asserts he did not specify that the pallets be made from green wood. (Parks Aff. ¶ 4, Doc. 42–4). Green wood is wood with moisture content above the fiber saturation point of wood, i.e., higher than 25–30%. (White Depo. 22–23, Doc. 36–6). Gary Shelton, Sales Manager for Atlanta Pallet, asserts in a letter to Kraft Foods dated November 29, 2007, that raw wood is "specified by you and most of our customers." (Shelton Depo. Ex. 4, Doc. 55–4). Raw wood from freshly cut trees has high moisture content and is green wood until it dries. Id.

5. According to Dr. Marshall White, Plaintiff's expert witness and a professor for the Wood Science and Forest Products Department at Virginia Polytechnic Institute and State University ("Virginia Tech"), some shippers measure moisture content of pallets when delivered, but Kraft did not. (White Depo. 66–69, Doc. 36–6).

6. Plaintiff alleges in its Complaint that Kraft Foods also shipped a container full of food products to Guatemala using Defendant's pallets and that this shipment similarly became contaminated with mold and was subsequently destroyed. (Compl. ¶ 5–7, 9). However, Plaintiff has introduced no evidence to support this claim. Plaintiff's Memorandum of Law in response to the Defendant's Motion for Summary references the discharge of the containers in Panama/Guatemala, and the Court notes it is conceivable that Kraft Foods intended to transport some of the containers to Guatemala over land. In any event, this evidentiary gap does not appear central to resolution of the summary judgment motion before the Court.

7. Plaintiff points to invoices from Atlanta Pallet to show that the pallets must have been supplied sometime between December 20, 2006, and November 14, 2007. (Parks Aff. ¶ 5, Ex. A, Doc. 42–4). Plaintiff offers no other definitive evidence to indicate when these particular pallets were delivered to its facility. Plaintiff asserts the pallets would have been delivered by Atlanta Pallet to Kraft Foods within a week/several weeks of loading them with products bound for Panama (PRDSMF ¶ 14, Doc. 42–1). To support this assertion, Plaintiff cites the Affidavit of Der-

The containers arrived in Panama in November 2007, during the rainy season; the weather was warm and humid. (DSMF ¶ 17, Doc. 36–2; PRDSMF ¶ 17, Doc. 42–1; Rojas Depo. 22–23, Doc. 36–10). There were puddles of water on the ground underneath the platforms where the containers were stored, but no puddles of water inside the containers. (DSMF ¶ 18, Doc. 36–2; PRDSMF ¶ 18, Doc. 42–1; Rojas Depo. 10, 32, Doc. 36–10). The platforms stood at least three feet off the ground. *Id.* at 40.

The containers and their contents were contaminated with mold when Panamanian inspectors first opened them.[8] (DSMF ¶ 19, Doc. 36–2; PRDSMF ¶ 19 Doc. 42–1). According to a Panamanian official who was present, the pallets were deteriorated and full of white fungi. (Arcia Depo. at 22–23, Doc. 51). The food packaging was also covered with white mildew. *Id.* Panamanian officials quarantined the containers and requested Valentin Rojas, a mycologist[9] at the University of Panama School of Medicine, examine the mold. *Id.* at 5–6.

Kraft Foods was notified of the problem and sent its representative, Jorge Sanchez, to oversee the inspection process and determine a course of action regarding the containers and their contents. (DSMF ¶ 20, Doc. 36–2; PRDSMF at ¶ 20, Doc. 42–1). On November 14, 2007, Kraft Foods' insurance agent requested that Rafael Rivera, a marine surveyor and insurance adjuster, inspect the contents of the containers and verify damage to the merchandise. (DSMF ¶ 21–22, Doc. 36–2; PRDSMF ¶ 21–22, Doc. 42–1).

Rojas, Sanchez, Rivera, and several Panamanian officials met and inspected the cargo. (DSMF ¶ 23, Doc. 36–2; PRDSMF ¶ 23, Doc. 42–1). They found mold on the inside of the containers, on the pallets, and on the products. (DSMF ¶ 24, Doc. 36–2; PRDSMF ¶ 24, Doc. 42–1). According to Rojas, the first thing he noticed was "very evident" mold growth on the pallets. (Rojas Depo. 8–9, Doc. 36–10). He also observed mold growth on some of the boxes containing food products. *Id.* Rojas "sensed" a high degree of humidity in some containers but did not measure the humidity. *Id.* at 11. Rojas saw a high mold concentration on the floor of the containers. *Id.* at 27. Some of the containers

---

reck Parks, but that affidavit does not contain this information or other facts from which such a reasonable inference could be drawn. Although Plaintiff's expert, Dr. Marshall White, asserts that Parks indicated to him that the pallets were not in storage for more than a couple of days before use because that is their standard procedure, this statement is hearsay and cannot therefore be considered (White Depo. 85–86, Doc. 36–6). *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) ("[I]nadmissible hearsay cannot be considered on a motion for summary judgment.") According to the bills of lading, the containers shipped out from the port of Savannah on October 17, 2007. (Sanchez Depo. 14, Ex. 1(a)–1(j), Doc. 49). There is no evidence indicating the exact date the containers arrived in Panama or how long they remained in port prior to inspection, although they clearly had arrived by early/mid-November 2007 when Panamanian officials conducted their first in-

spection. According to the Panamanian transportation logistics supervisor in charge of Kraft's account, the transit from Norfolk to Panama's Balboa port usually takes 10–12 days. *Id.* at 15. Plaintiff admits that the containers were stored "for a certain period of time" at the Balboa port. (PRDSMF ¶ 17, Doc. 42–1).

8. Technically, government inspectors and analysts detected multiple forms of fungi. (Rojas Depo. 15, Doc. 36–10). Mold and mildew are both types of fungi. For simplicity and consistency, the Court uses the term "mold" to represent all fungi, including mildew, because mold is the term upon which the parties seem to agree.

9. A mycologist, among other things, specializes in the study of fungi that cause illnesses in humans and animals. (Rojas Depo. 5, Doc. 36–10).

were damaged and had holes in them. *Id.* at 28, 30. The containers without holes also had mold growth, but the containers with holes had a higher degree of humidity and mold. *Id.* at 28–29.

On November 21, 2007, Rojas took samples of the mold found on the pallets and packages to be lab-tested. (DSMF ¶ 25, Doc. 36–2; PRDSMF ¶ 25, Doc. 42–1). Samples of the actual food products were not tested for mold. (DSMF ¶ 29, Doc. 36–2; PRDSMF ¶ 29, Doc. 42–1). Based on this testing, Rojas determined that the mold could be harmful to humans and animals. (DSMF ¶ 25, Doc. 36–2; PRDSMF ¶ 25, Doc. 42–1). As a result of this determination, Panamanian officials rejected the shipment and directed Kraft Foods to export the cargo or incinerate it. (DSMF ¶ 26, 33, Doc. 36–2; PRDSMF ¶ 26, 33, Doc. 42–1). The timeline is unclear, but at some point, Panamanian quarantine officers also asked Kraft Foods to fumigate the containers. (Sanchez Depo. 12, Doc. 49). According to Rivera, the cargo was fumigated, and Kraft Foods awaited the outcome of the fumigation process while determining whether to return the cargo to the port of origin or destroy it. (Rivera Depo., 14, Doc. 54).

Shortly after Kraft Foods became aware of the mold contamination of its overseas shipments, its personnel noticed mold on a new delivery of pallets from Atlanta Pallet to its Norcross facility. (Parks Aff. ¶ 11, Doc. 42–4). Kraft Foods rejected the moldy pallets, and Atlanta Pallet removed them. *Id.* This was the first time Kraft Foods had ever rejected a shipment from Atlanta Pallet or had a problem with the pallets it supplied. (DSMF ¶ 10, Doc. 36–2; PRDSMF ¶ 10, Doc. 42–1).

On November 27, 2007, Steve Balogh, team leader of the customer logistics section in the Export Supply Chain Operations Department at Kraft Foods, sent a letter to Atlanta Pallet's General Manager Zilhad Dzihic stating that Kraft Foods would hold Atlanta Pallet fully liable for losses resulting from the mold contamination and that Kraft Foods' insurance carrier would communicate with Dzihic shortly. (Balogh Aff. Ex. A, Doc. 42–13). Upon receiving this letter, Atlanta Pallet President William Lewis called the National Wooden Pallet and Container Association (the "NWPCA") to solicit advice on how to prevent mold in order to formulate a response to its customer's concerns. (Lewis Depo. 19–20, 38, Doc. 56). Dzihic and Atlanta Pallet Sales Manager Gary Shelton then went to Kraft Foods' Norcross facility and met briefly separately with Parks and another Kraft Foods manager to discuss potential causes of the mold and methods to prevent mold growth. (Shelton Depo. 40, Doc. 55–4). On November 29, 2007, Shelton sent a letter to Eilrich summarizing their meeting and suggesting steps that could be taken to help prevent mold growth. *Id.* at Ex. 4. Shortly thereafter, Kraft Foods discontinued purchasing heat-treated pallets from Atlanta Pallet because of mold concerns.[10] (Parks Aff. ¶ 12, Doc. 42–4). No evidence was submitted indicating that Atlanta Pallet ever asked to inspect the contents of the containers that arrived in Panama contaminated with mold.

About six weeks later, Kraft Foods chose to incinerate the contaminated cargo rather than export it. (DSMF ¶ 27, 34, Doc. 36–2; PRDSMF at ¶ 27, 34, Doc. 42–1). Beginning on January 12, 2008, all of the contaminated products and pallets

---

10. Kraft Foods did continue purchasing regular white wood pallets from Atlanta Pallet.

(Parks Depo. at 6–7, Doc. 36–5).

were incinerated in the presence of Rivera, Sanchez, and Panamanian officials. (Rivera Depo. 26, Doc 54; DSMF ¶ 27, 34, Doc. 36–2; PRDSMF at ¶ 27, 32, 34, Doc. 42–1). There is no evidence that Kraft Foods ever notified Atlanta Pallet that the contaminated cargo would be destroyed. Neither party submitted evidence explaining Kraft Foods' decision to destroy the contaminated cargo rather than export it.

Prior to the destruction of the products and pallets, Rivera did not measure the humidity, ambient temperature, or the moisture content of the products or pallets, nor did he attempt to determine the precise origin of the mold. (DSMF ¶ 28, Doc. 36–2; PRDSMF at ¶ 28, Doc. 42–1). He did not photograph the bottoms of the containers or sample the puddles of water underneath them. (DSMF ¶ 30, Doc. 36–2; PRDSMF ¶ 30, Doc. 42–1). He was not asked to check the kiln stamps on the pallets or determine who supplied the pallets. (DSMF ¶ 38, Doc. 36–2; PRDSMF ¶ 38, Doc. 42–1). Rivera stated that due to safety concerns, he was not able to get closer to the containers and take pictures during the incineration of the goods. (Rivera Depo. Ex. 1, Doc. 54–1). The scope of his inspection was limited to examining and verifying the damage to the cargo. (DSMF ¶ 35, Doc. 36–2; PRDSMF ¶ 35, Doc. 42–1). He was not asked to determine the cause or source of the mold or to preserve any evidence. (DSMF ¶ 36, Doc. 36–2; PRDSMF ¶ 36, Doc. 42–1). No samples were retained for future testing. (DSMF ¶ 28, Doc. 36–2, PRDSMF ¶ 28, Doc. 42–1). The record is silent as to why no samples of the physical evidence (the cargo containers, pallets, food product packaging, and food product) were preserved in an appropriate manner (e.g., in an airless vacuum sealed container) considering the health and safety concerns.

Pursuant to its cargo insurance policy, Kraft Reinsurance paid Kraft Foods a total of $363,555.10 as settlement for its claim stemming from the cargo destruction. (Jarrett Aff. ¶ 6, Ex. A1–A6, Doc. 42–9). A Kraft Foods employee [11] in turn signed subrogation receipts for Kraft Reinsurance dated in the period December 9, 2008, to February 24, 2011. *Id.* All of these receipts state that "by virtue of such payment Underwriters became subrogated to all our rights and remedies in and in respect to the subject matter insured" and that "you have the authority to use our name to the extent necessary effectively to exercise all or any of such rights and remedies." *Id.*

On December 15, 2009, Plaintiff Kraft Reinsurance filed its Complaint setting forth two causes of action: breach of warranties (Count I) and negligence (Count II). (Compl. ¶ 12–16, Doc. 1). On January 27, 2011, Atlanta Pallet moved for summary judgment on both of these counts and alternatively for dismissal as a sanction for spoliation of evidence. (Def.'s Mot. Summ. J. ("MSJ"), Doc. 36).

**B. Principles of Mold Formation on Wooden Pallets**

The record contains uncontroverted evidence that high surface moisture increases the risk of mold formation on wooden pallets; that heat-treatment increases surface moisture; and that drying reduces the risk of mold formation. Defendant offers no evidence contradicting these principles described by Plaintiff's expert witness, Dr. Marshall White, a professor at Virginia Tech's Wood Science and Forest Products department.[12] (White Depo. 5, Doc. 36–6).

---

11. The signatures appear to be those of Steve Balogh.

12. Defendant does not challenge Dr. White's qualifications.

Dr. White states that optimal conditions for mold growth include wood surfaces with moisture content over 20%, air temperatures of 66 to 90 degrees Fahrenheit, dark or dim light, and little or no air movement. (White Aff. Ex. 1, Doc. 42–3). He explains that during the heat-treatment process, moisture and nutrients from inside the wood migrate to its surface, increasing the moisture content of the wood surface. (White Depo. 101, Doc. 36–6). Dr. White opines that the best way to control mold growth on pallets is to dry and maintain their wood surfaces to less than 20% moisture. (White Aff. Ex. 1, Doc. 42–3). In his professional opinion, if pallets are placed into enclosed containers without ventilation, wood should be dried to a lower average moisture content of 15 to 19%. *Id.* Dr. White's also testified that drying pallets will significantly reduce the possibility of mold contamination, but will not eliminate it completely. (White Depo. 37, Doc. 36–6).

## C. Atlanta Pallet's Prior Knowledge Regarding Mold Risks

The evidence is in conflict as to whether Atlanta Pallet knew about the increased risk of mold on its pallets due to moist heat-treated wood, or whether drying its pallets would minimize that risk. The evidence is similarly in conflict regarding how long these issues have been widely known in the pallet industry. Atlanta Pallet President William Lewis asserts that in November 2007, mold was not much of an issue in the industry. (Lewis Depo. 23, Doc. 56). Lewis states the first time the mold issue came to his attention was when Kraft Foods complained; per Lewis, this

was the first time a customer had complained about mold. (White Depo. 19, Doc. 36–6).

Dr. White asserts that the problem of mold growth on pallets and the potential for product contamination, as well as appropriate mitigation procedures, have been well-documented over the past ten or more years. (White Aff. Ex. 1, Doc. 42–3). He states that many articles have been written in pallet trade publications, and that mold growth has been the frequent subject of presentations at pallet trade association conferences, including the National Wooden Pallet and Container Association (the "NWPCA"). He further asserts that short courses are offered annually and attended by pallet suppliers. *Id.* Dr. White contends that many pallet manufacturers have therefore adopted drying systems such as dry kilns and fan sheds to dry pallets, and that other pallet suppliers routinely air dry pallets. (White Aff. Ex. 1, Doc. 42–3). Atlanta Pallet did not measure the moisture content of its wood and used no drying procedures prior to November 2007. (Lewis Depo. 33–34, Doc. 56; Dzihic Depo. 21–23, Doc. 50).

In an effort to show that Atlanta Pallet was aware of these issues prior to November 2007, Plaintiff proffers a number of articles from industry publications describing the problem of mold growth on wood pallets and prevention and control procedures. (Lewis Depo. Ex. 5–16, Doc. 56). Atlanta Pallet likely received these publications.[13] However, there is no evidence that anyone at Atlanta Pallet actually read these articles.[14]

---

**13.** Lewis testified in his deposition that he has been a regular subscriber to *Pallet Enterprise* for "quite a while" and that he also receives *Pallet Profile* and *Pallet Central*. (Lewis Depo. 15–16, Doc. 56).

**14.** Lewis does not recall reading any of the articles Plaintiff has submitted. (Lewis Depo. 17–28, Ex. 5–16, Doc. 56). Lewis does not recall seeing a single document generated by any source that recommended keeping wood surface moisture below 20% to prevent mold

Plaintiff also indicates that Atlanta Pallet leases pallet design software from the NWPCA, and the user guide to this software cautions that "[w]et pallets can contaminate and damage products and packaging. Moisture content >= 19% will eliminate this potentially serious problem." (White Depo. 93–94, Doc. 36–6; White Aff. Ex. 2, Doc. 42–3). However, there is no evidence that anyone at Atlanta Pallet ever read this particular warning in the user guide.

Plaintiff also submits evidence that NWPCA held seminars on manufacturing dry wood pallets and mold prevention and that as members of NWPCA, Atlanta Pallet would have received information about those seminars. (White Depo. 95–96, Ex. 1, Doc. 36–6). Lewis attended a seminar Dr. White taught in 1998, but there is conflicting evidence as to whether mold formation was a topic of discussion.[15]

There are no industry standards or regulations that specifically limit moisture content in wooden pallets. (White Depo. 110, Doc. 36–6). According to the Uniform Standard for Wooden Pallets ("USWP"), published by the NWPCA, the "moisture level of pallet components is not limited." (*Id.* at 11–12; Lewis Depo. Ex. 20 at 5, Doc. 56–30). The only other place in the USWP where moisture content is mentioned is in a section on "Other Defects" of pallet components that can affect their quality. (White Depo. 71, 103, Doc. 36–6; Lewis Depo. Ex. 20 at 36, Doc. 56–30). The USWP contains no information about drying procedures to minimize moisture

content. (White Depo. 13–14, Doc. 36–6; Lewis Depo. Ex. 20, Doc. 56–30).

International Standards for Phytosanitary Measures (ISPM) heat-treating regulations are silent regarding moisture and mold. (Lewis Depo. 28, Doc. 56). Since Atlanta Pallet began heat-treating pallets in 2004, the American Lumber Association has licensed an auditor to perform unannounced monthly audits of Atlanta Pallet's heat-treatment process to certify that they are in compliance with ISPM15. *Id.* at 49. The auditor has never issued any documentation suggesting non-compliance. *Id.* at 49–50. The auditor also has not given Atlanta Pallet any direction regarding moisture content after heat-treatment. *Id.* at 50.

## III. Analysis

### A. Negligence Claim

■■■ As the Court's jurisdiction in this matter is based on diversity of citizenship, the choice of law rules of Georgia as the forum state determine the applicable substantive law. *U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir.2008). Georgia applies the substantive law of the place where the tort or wrong was committed or where the injury was incurred. *Dowis v. Mud Slingers, Inc.*, 279 Ga. 808, 621 S.E.2d 413, 419 (2005). It is undisputed that all of the actions relevant to Plaintiff's negligence claim took place in Georgia. Therefore, Georgia law applies. To recover on a negligence claim in Georgia, Plaintiff must

---

formation. *Id.* at 48. He usually is the only one at Atlanta Pallet who reads these publications, but if he thinks a matter is important, he will pass on an article or comments to the appropriate person. *Id.* at 16–17. Dzihic also does not recall reading any of these articles. (Dzihic Depo. 29, Doc. 50).

**15.** Lewis asserts that the topic of mold formation never came up at this seminar. (Lewis Depo. 20–21, Doc. 56). Dr. White says Lewis's comment is incorrect and that he probably discussed moisture issues for a couple of hours during the two-and-a-half-day course, and that this issue is discussed at almost every course he conducts on pallets. (White Depo. 98–99, Doc. 36–6).

show 1) the existence of a legal duty, 2) breach of that duty, 3) a causal connection between the defendant's conduct and the plaintiff's injury, and 4) damages. *Seymour Elec. & Air Conditioning Serv., Inc. v. Statom*, 309 Ga.App. 677, 710 S.E.2d 874, 877 (Ga.Ct.App.2011) (citation omitted).

### 1. Duty and Breach

The parties dispute Defendant's scope of duty in this matter and whether that duty was breached. Atlanta Pallet argues that its only duty was to provide Kraft Foods exactly what it ordered—heat-treated wooden pallets—and that it was not asked to provide pallets with any particular moisture content. (Def.'s Br. 3, 11, Doc 36–1). Atlanta Pallet claims that it fulfilled its duty by providing the heat-treated pallets in exact compliance with Kraft Foods' specifications. *Id.* at 11–12.

Plaintiff contends that Atlanta Pallet owed Kraft Foods a duty to supply it with properly dried pallets that would not cause mold formation, and that it breached that duty. (Pl.'s Br. 2, Doc. 42–2). Plaintiff argues that prior to selling pallets to Kraft Foods, Atlanta Pallet had constructive knowledge that excessive moisture on pallets causes mold formation, that heat-treatment exacerbates mold formation, and that proper drying after heat-treatment is required to prevent mold formation. *Id.* Plaintiff's expert Dr. White asserts that it is "common knowledge" that pallets transported on freight containers have to be dry and that "the pallet industry dries pallets for that purpose." (White Depo. 86–87, Doc. 36–6). Despite this alleged knowledge, Atlanta Pallet did not dry its pallets.

The evidence indicates that Atlanta Pallet knew its heat-treated pallets would be used for overseas shipments. Lewis admits knowledge that the pallets would be shipped internationally, but says he never specifically discussed details of the shipments. (Lewis Depo. 36–37, Doc. 56). In Dr. White's expert opinion, the pallet supplier is responsible for determining how its customer will use its pallets and for advising the customer that the heat-treated pallets must be dry. (White Depo. 108, Doc. 36–6). He states in particular that Atlanta Pallet should have been aware of the international usage for the pallets because Kraft had required ISPM15 compliance, and it "should have advised Kraft that drying the pallet was necessary if they were to be used in freight containers for export." (White Aff. Doc. 42–3, Ex. 1 at 11–12). Dr. White indicates he would not expect Kraft Foods to know that dry pallets are necessary to prevent mold problems and product contamination. (White Aff. Doc. 42–3, Ex. 1, Doc. 42–3). His supplemental export report concludes that "Atlanta Pallet Corporation should have recommended and supplied a dry wood pallet to Kraft for exportation of their food products." (White Aff. Ex. 1 at 37, Doc. 42–3).

Drawing all justifiable inferences in favor of Plaintiff, a genuine issue of material fact exists regarding whether Atlanta Pallet had a duty to advise Kraft Foods regarding wood drying issues, or alternatively, to supply a dry wood pallet for use in export under these circumstances. Although Dr. White's opinion provides persuasive evidence, the core fact remains that established industry standards contained no provisions requiring Atlanta Pallet to dry its pallets. Evidence showing a violation of "privately set guidelines" for industry standards is admissible and probative of negligence, but does not conclusively establish negligence or duty owed. *Spearman v. Georgia Bldg. Auth.*, 224 Ga.App. 801, 482 S.E.2d 463, 465 (Ga. Ct.App.1997). However, this evidence, in conjunction with the previously described

depositions, clearly creates a jury question as to whether Atlanta Pallet was cognizant of the increased risk of mold on its pallets due to moist heat-treated wood or that drying its pallets would minimize that risk for those pallets used for international transportation. If the jury were to con-clude that Atlanta Pallet had such knowl-edge, it could further conclude that Atlanta Pallet had a duty to dry its pallets or inform Kraft Foods that pallets used for overseas shipping should be dry. Even if Atlanta Pallet supplied Kraft Foods with the exact type of pallets it requested, a jury could properly determine that Defen-dant failed to use reasonable care when manufacturing the pallets because it negli-gently failed to adhere to standard pallet industry practices for addressing the risks of moisture and mold in pallet construction for international transport.

### 2. Causation and Damages

Defendant's motion properly contends that Kraft Foods cannot provide disposi-tive proof that the pallets supplied by At-lanta Pallet were the cause of the mold damage to its Panamanian cargo. (Def's Br. 12–14, Doc. 36–1). Defendant identi-fies a host of problems in Plaintiff's proof of causation, including: Plaintiff's failure to fully explain the timeline of events be-tween receipt of the pallets to the inspec-tion by Panamanian officials; Plaintiff's failure to inspect the pallets to conclusively determine the manufacturer; and Plain-tiff's failure to determine the source and cause of the mold by performing moisture readings of the pallets and products, as well as Plaintiff's failure to preserve some of this evidence for future testing. *Id.* at 6–9. Defendant also suggests that other likely factors, such as unnecessarily pro-longed and inappropriate storage of the cargo in extremely humid or wet condi-tions in containers which were not com-pletely sealed from the elements, may have caused the mold infestation. (*See* Section II.A. above.)

Plaintiff has submitted substantive evi-dence directly addressing the Defendant's causation contentions, thereby creating a genuine dispute of material facts ripe for jury determination. Plaintiff's expert Dr. White, a well-recognized expert in the field of wood science, concluded that in all likeli-hood, the pallets were the source of the moisture that led to the mold growth be-cause the packages of food products were presumably very dry when shipped.[16] (White Depo. 83–84, Doc. 36–6). He dis-missed Defendant's alternative causation theories, e.g., that the pallets were kept in conditions at Kraft Foods' facility or in the freight containers for a length of time that would greatly increase the risk of mold contamination. He opined that there could not have been enough humidity in the am-bient air in the containers to have caused sufficient surface moisture for mold forma-tion. (White Aff. Ex. 1, Doc. 42–3; White Depo. 38, Doc. 36–6). After touring the Kraft Foods Norcross facility, Dr. White also concluded that the company's storage procedures were "excellent" and appropri-ate for preventing mold. *Id.* at 52–53. While a reasonable jury could decide to give greater weight to evidence that sever-al of the containers had holes in them or were stored outdoors for an unspecified duration during the Panamanian rainy sea-son, it could also reasonably determine that Dr. White's testimony is persuasive evidence of causation.

Plaintiff presented additional evidence to establish causation. When the containers

---

**16.** Dr. White assumed that none of the boxes were wet when shipped but concedes that an external source of water, if present, could be a contributing factor. (White Depo. 84, Doc. 36–6).

were opened in Panama, inspectors found that the pallets were deteriorated and covered with evident mold growth.[17] Plaintiff buttresses its position with evidence of visible mold on pallets Atlanta Pallet delivered to its Norcross facility shortly after the Panamanian shipment disaster. Plaintiff has submitted evidence to show that Atlanta Pallet was its only supplier of heat-treated pallets during this period and that no question arose as to the correct identification of the pallets at issue in November 2007 when Kraft Foods' managers met with Atlanta Pallet representatives regarding the mold growth. Viewing these facts as a whole, a reasonable jury could determine that excessive moisture emanating from the Defendant's pallets was the cause of the mold infestation, and that Defendant's failure to properly dry these pallets caused the excessive moisture, although it might also reasonably conclude otherwise.

In sum, the evidence submitted in connection with Defendant's Motion for Summary Judgment demonstrates that genuine issues of material of fact requiring resolution by a jury exist as to critical elements of Plaintiff's negligence claim. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's negligence claim (Count II) is **DENIED.**

## B. Breach of Warranties Claim

Plaintiff further argues that Atlanta Pallet breached implied warranties of merchantability and fitness for intended purpose by supplying Kraft Foods with defective, improperly dried pallets. (Compl. ¶ 13, Doc. 1). "Warranties made in connection with the sale of goods are controlled by the Uniform Commercial Code [(UCC)], O.C.G.A. § 11–1–101 *et seq.*" *Nationwide Mut. Ins. Co. v. Kershaw*

*Mfg. Co., Inc.,* 198 Ga.App. 153, 401 S.E.2d 23, 24 (Ga.Ct.App.1990). The parties do not dispute that the UCC applies to the sale of pallets as goods.

### 1. Plaintiff's Standing

As a threshold matter, Defendant contends that Plaintiff Kraft Reinsurance does not have standing to assert an implied warranty claim under the UCC because it did not enjoy purchasing privity with Atlanta Pallet and is not within the class of beneficiaries identified in O.C.G.A. § 11–2–318. (Def.'s Br. 15, Doc 36–1). The Court disagrees.

 The legal principles and case law Defendant cites arise in cases where Georgia courts have disapproved extending the *warranty itself,* as opposed to those cases that recognize the principal injured party's assignment of an *existing warranty claim.* Under Georgia law, "direct privity between the seller and buyer of goods" is normally required for the implied warranty of merchantability to apply. *Terrill v. Electrolux Home Products, Inc.,* 753 F.Supp.2d 1272, 1288 (S.D.Ga.2010). The UCC additionally, as Defendant recognizes, extends implied warranty coverage to members of the family or household of the buyer who might reasonably use or be affected by breach of the warranty. O.C.G.A. § 11–2–318. These principles, however, are inapposite here. Georgia courts recognize that "while a warranty cannot be assigned, the UCC does authorize the assignment of a purchaser's *claim* for an existing breach of the warranty." *Nationwide Mut. Ins. Co.,* 401 S.E.2d at 24 (quotes and citation omitted) (emphasis added). This assignment of the purchaser's claim, indeed, is expressly authorized

---

**17.** The high mold concentration on the container floor may reflect that the mold spores emanated from the pallets—or as implied by Defendants, the very opposite.

by OCGA § 11–2–210(2).[18] "Any language, however informal, will be sufficient to constitute a legal assignment, if it shows the intention of the owner of the right to transfer it instantly, so that it will be the property of the transferee." *Id.* (quotes and citation omitted). In the instant case, Plaintiff's subrogation receipts clearly constitute sufficient evidence of a legal assignment of Kraft Foods' implied warranty claim. (Jarrett Aff., Ex. 1–6, Doc. 42–9) Accordingly, Plaintiff has proper standing to bring this claim.

### 2. Implied Warranty of Merchantability

■ The first warranty relevant here is the implied warranty of merchantability. In a contract for the sale of goods, "[u]nless modified or excluded ... a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." O.C.G.A. § 11–2–314(1). It is undisputed that Atlanta Pallet is a pallet merchant. For the goods to be merchantable, they must "be at least such as ... [a]re fit for the ordinary purposes for which such goods are used". O.C.G.A. § 11–2–314(2)(c).. To recover, the plaintiff must show "not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained." O.C.G.A. § 11–2–314, UCC Comment 13. To prove breach, the plaintiff must show the goods had a latent defect at the time of sale that was not discoverable by the exercise of caution on his part. *Hines v. Mercedes–Benz USA,*

*LLC,* 358 F.Supp.2d 1222, 1232 (N.D.Ga. 2005); *Willis Min., Inc. v. Noggle,* 235 Ga.App. 747, 509 S.E.2d 731, 733 (1998). "Generally, whether a latent defect existed at the time of sale is a jury question." *Soto v. CarMax Auto Superstores, Inc.,* 271 Ga.App. 813, 611 S.E.2d 108, 109 (2005) (citation omitted).

■ It is undisputed that the implied warranty of merchantability applied to the heat-treated pallets Atlanta Pallet supplied. It is similarly undisputed that Kraft Foods used the heat-treated pallets for the ordinary purpose for which they are intended, i.e. to ship products overseas.

There are genuine issues of material fact as to whether the pallets had a latent defect at the time of sale which was not discoverable by Kraft Foods and which made them unfit for shipping products overseas. Plaintiff's expert testimony indicates that many pallet manufacturers are aware of mold issues caused by surface moisture on green heat-treated wood and as a result, are drying pallets used for export. However, neither the USWP pallet manufacturing standards nor the ISPM heat-treatment standards require any specific moisture content. This conflicting evidence raises a question of fact as to whether pallets with high moisture content are defective and unfit for shipping products overseas. Furthermore, there is a question of fact as to whether such moisture, if present, was a latent defect that was not discoverable by the exercise of due caution by Kraft Foods. Its personnel could have taken moisture readings, but did not. Whether they should have done

18. OCGA § 11–2–210(2) provides: "Except as otherwise provided in Code Section 11–9–406, unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on the other party by the contract, or impair materially the other party's chance of obtaining return performance. A right to damages for breach of the whole contract or a right arising out of the assignor's due performance of the assignor's entire obligation can be assigned despite agreement otherwise."

so poses a question of fact for the jury. Just as with its negligence claim, in order to prevail, Plaintiff would also need to prove that the alleged defect proximately caused its incidental and consequential losses.

Atlanta Pallet argues that it did not breach any warranty because it fully complied with the specifications of its contract with Kraft Foods. (Def.'s Br. 14, Doc. 36–1). However, a "specific designation of goods by the buyer does not exclude the seller's obligation that they be fit for the general purposes appropriate to such goods." O.C.G.A. § 11–2–314, UCC Comment 3. Therefore, Atlanta Pallet's compliance with Kraft Foods' specifications does not eliminate its duty to supply merchantable pallets. As there are genuine issues of material fact regarding Plaintiff's claim for breach of the implied warranty of merchantability, summary judgment is inappropriate.

### 3. Implied Warranty of Fitness for a Particular Purpose

The second relevant warranty is the implied warranty of fitness for a particular purpose. In a contract for sale of goods, a warranty is implied that the goods will be fit for a particular purpose when "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." O.C.G.A. § 11–2–315. "Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting." O.C.G.A. § 11–2–315, UCC Comment 1.

■ Here, it is undisputed that Atlanta Pallet knew Kraft Foods would be using its heat-treated pallets to ship products overseas. It is similarly undisputed that Kraft Foods specifically requested 40″ × 48″ heat-treated pallets and that the pal-

lets supplied by Atlanta Pallet met these specifications. However, it is also undisputed that Kraft Foods did not specify any particular moisture content for the pallets it ordered. There is conflicting evidence in the record as to whether Kraft Foods requested green or raw wood or whether Atlanta Pallet decided unilaterally to use green wood. Accordingly, there is a question of fact as to whether Kraft Foods relied on Atlanta Pallet's skill and judgment to supply it with pallets with appropriate moisture content for shipping products overseas in freight containers and whether Atlanta Pallet failed to do so. Accordingly, summary judgment is inappropriate, and Defendant's motion for summary judgment on the implied warranties claim (Count I) is **DENIED.**

### C. Spoliation of Evidence

As an alternative to its summary judgment motion, Atlanta Pallet moves for dismissal of this case as a sanction based on Plaintiff's alleged spoliation of evidence. (Def.'s MSJ, Doc 36). Defendant argues this sanction is appropriate because Kraft Foods and Kraft Reinsurance destroyed the contaminated cargo after litigation was contemplated, thereby irreparably thwarting and prejudicing Atlanta Pallet's capacity to present a proper defense. (Def.'s Br. 17, Doc. 36–1; Def.'s Reply Br. 11, Doc. 45). Plaintiff denies that it contemplated litigation at the time the pallets were incinerated and denies that spoliation occurred.

■ In a diversity suit, federal law governs the imposition of spoliation sanctions because they "constitute an evidentiary matter." *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 944 (11th Cir.2005). As the Eleventh Circuit noted in *Flury,* Georgia law is consistent with federal spoliation principles and provides useful specific guidelines for resolving disputes in-

volving potential spoliation sanctions. *Id.* To rule on this motion, the Court must first determine whether spoliation occurred and if so, what sanctions, if any, may be appropriate.

### 1. Whether Spoliation Occurred

"Spoliation is the destruction ... of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.*, 310 Fed.Appx. 298, 301 (11th Cir.2009). To be reasonably foreseeable, litigation must have been contemplated—mere awareness of potential liability is insufficient to trigger a duty to preserve evidence. *Kitchens v. Brusman*, 303 Ga.App. 703, 694 S.E.2d 667, 671 (Ga.Ct.App.2010), *reconsideration denied* (Apr. 14, 2010), *cert. denied* (Sept. 20, 2010) (citation omitted). It is undisputed that Kraft Foods and its insurer destroyed the contaminated cargo and that this cargo had evidentiary value. Thus the Court must determine whether they destroyed this evidence at a time when they had filed or were contemplating litigation, not merely when they were aware that Defendant might be liable.

Litigation was clearly contemplated at the time this evidence was destroyed. Plaintiff argues somewhat implausibly that it was merely aware of Atlanta Pallet's potential liability and that there is no evidence that litigation was reasonably foreseeable when the contaminated cargo was incinerated in mid-January 2008. (Pl.'s Br. 11, Doc. 42–2). Evidence to the contrary is presented in the record with Kraft Foods' letter dated November 27, 2007, warning Atlanta Pallet that it would be held liable. The letter manifested an unambiguous intention to pursue litigation if necessary: "We will be holding Atlanta Pallet & Services fully liable for the result-

ing losses which are still being determined. Our insurance carrier will be in touch with you shortly regarding this claim." (Balogh Aff. Ex. A, Doc. 42–13). Considering that Kraft Foods' management had already "had discussions"[19] with Defendant's representatives about the mold infested pallet shipment and then remitted the above letter regarding liability, there is reasonable evidence to suggest that litigation was a clear option within Kraft Foods' contemplation at that point in time. Plaintiff's level of litigation "contemplation" here falls squarely within that recognized as grounds for a spoliation claim in *Kitchens,* where the Court noted:

> "Contemplated" has been defined as "to view as contingent or probable or as an end or intention"; "contemplate" has been defined as "to have in mind as a possibility or plan; expect or intend"; and "contemplation" has been defined as "[c]onsideration of an act or series of acts with the intention of doing or adopting them."

*Kitchens,* 694 S.E.2d at 671. As in *Kitchens,* this was not a situation where liability was simply a theoretical possibility, but instead one where both parties were aware that Kraft Foods viewed litigation as a possible course of action, and that it had considered initiating a claim against Defendant before the evidence was destroyed. Therefore, the Court finds that spoliation of evidence did occur here.

### 2. Spoliation Sanctions

Having determined that spoliation occurred, the Court must decide whether sanctions are warranted and if so, what sanctions will be imposed. District Courts have "broad discretion ... to impose sanctions." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir.

---

**19.** *See* Balogh Aff. Ex. A, Doc. 42–13.

2005). "[I]n determining whether sanctions for spoliation are warranted, the trial Court must weigh the degree of the spoliator's culpability against the prejudice to the opposing party." *Bridgestone/Firestone N. Am. Tire, LLC v. Campbell,* 258 Ga.App. 767, 574 S.E.2d 923, 927 (Ga.Ct. App.2002). Five factors guide the Court in this evaluation: "(1) whether the defendant was prejudiced as a result of the destruction of the evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the plaintiff acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded." *Id.* at 926 (citation omitted).

 First, Atlanta Pallet argues that it is prejudiced by the destruction of the contaminated cargo because it was denied the opportunity to inspect it. (Def. Br. 17, Doc. 36–1). Defendant argues that without evidence from the cargo, it is unable to rebut Plaintiff's allegations that Atlanta Pallet supplied the pallets or that Defendant's pallets caused mold contamination and product damage. *Id.* at 18. There is no evidence, however, indicating that Atlanta Pallet was denied the opportunity to inspect the contaminated cargo prior to its destruction, nor is there any evidence that it attempted to do so. On the other hand, had Kraft Foods notified Atlanta Pallet of the pallets' imminent destruction, Defendant may well have sent a representative to Panama to inspect the evidence before it was destroyed or exported. Alternatively, Kraft Foods could have arranged to maintain a small appropriately air-sealed sample of the pallet wood and items stored within the pallet containers. Due to the destruction of the physical evidence, Atlanta Pallet was placed in a position that it could not verify the brand of the pallets, the cause of the mold, or the condition of the containers and the items contained therein. Therefore, Defendant's ability to defend itself was thus prejudiced by its loss of the opportunity to independently evaluate evidence critical to the claims asserted in this case.

Atlanta Pallet argues there is no way to cure this prejudice at this juncture, because any form of meaningful examination of the physical evidence for assessment of the source of the mold at issue is impossible. (Def.'s Br. 19–20, Doc. 36–1). The incinerated cargo cannot be brought back from the ashes, and Atlanta Pallet is therefore left in the position of re-constructing the evidence in the record to glean information regarding other possible pallet suppliers and other possible causes of the mold. In that respect, Atlanta Pallet can rely on the same inspection reports, photographs and depositions that Plaintiff points to as well as present expert testimony in support of its defense. Still, as Atlanta Pallet argues, the destruction of the evidence here carries practical significance for the litigation of critical causation issues in this case and therefore must be deemed to have prejudiced Defendant's defense.

Atlanta Pallet argues that Kraft acted in bad faith by destroying all of the evidence without any notification. (Def.'s Br. 21, Doc. 36–1). However, aside from the evident health hazards that prompted the Panamanian quarantine order, the record is at this point silent as to Kraft Foods' decision making, and in particular, (1) why Kraft Foods decided to destroy the contaminated cargo as opposed to shipping it back to the United States for further evaluation, as authorized by Panamanian officials; (2) why Kraft Foods did not preserve a sample of the mold infected goods for later testing; and (3) why it did not notify Atlanta Pallet of the possibility of incineration of the containers and the pallets or the final incineration decision, given

the time lapse between the parties' November 2007 meeting and the incineration effected in January 2008. The record, in short, is silent on facts that would be essential for the Court's determination of whether Kraft Foods' wholesale destruction of the evidence was motivated by malice, bad faith, or some legitimate factor.

Finally, Atlanta Pallet argues that there is potential for abuse if testimony from Plaintiff's expert witness is not excluded because it cannot rebut that testimony. (Def.'s Br. 23, Doc. 36–1). Plaintiff relies heavily on its expert's testimony in order to establish causation. This give Plaintiff a significant advantage because this testimony will no doubt have much greater relative weight as a result of the destruction of other possibly countervailing evidence. However, Plaintiff's expert was not hired until after the contaminated cargo was destroyed, so he had no access to it. His report is based primarily on photos and depositions of individuals who had no interest in determining causation. There is nothing stopping Atlanta Pallet from having its own expert evaluate this same evidence, but this opportunity for competing expert testimony cannot replace the missing evidence.

■■■ Weighing these factors, the Court must decide what sanctions, if any, are appropriate. "As sanction for spoliation of evidence, a Court may (1) dismiss the case, (2) exclude expert testimony, or (3) issue a jury instruction on spoliation of evidence which raises a presumption against the spoliator." *Heath v. Wal–Mart Stores E., LP,* 697 F.Supp.2d 1373, 1378 (N.D.Ga. 2010) (citation omitted). *See, generally, Chapman v. Auto Owners Ins. Co.,* 220 Ga.App. 539, 469 S.E.2d 783 (1996) (con-taining extensive discussions of sanction review considerations).

■■■ The record at this point is insufficient to conclude that dismissal is warranted. "Dismissal represents the most severe sanction available to a federal Court, and therefore should only be exercised where there is a showing of bad faith and where lesser sanctions will not suffice." *Flury,* 427 F.3d at 944. Although "Georgia law does not require a showing of malice in order to find bad faith," the Court must "weigh the degree of the spoliator's culpability against the prejudice to the opposing party." *Id.* at 946. In the absence of evidence regarding Kraft Foods' reasons for incinerating the entire cargo without prior notification to Atlanta Pallet, preserving samples, etc., the Court cannot properly evaluate the degree of the Plaintiff's culpability. Without these missing facts, the Court finds that it is inappropriate to impose the extreme sanction of dismissal at this time, particularly given the unique health quarantine circumstances surrounding the order for the pallets' incineration or return to port of entry. Accordingly, the Court **DENIES** the Defendant's alternate motion for dismissal. However, given the potential impact of the spoliation issues on the trial of this case, the Court will hold a pre-trial evidentiary hearing to determine whether any remedial measures or sanctions[20] are warranted.

## IV. Conclusion

For the foregoing reasons, the Court **DENIES** Defendant's motion for summary judgment or alternative motion to dismiss [Doc. 36]. A pre-trial evidentiary hearing on the matter of spoliation of sanctions will

---

20. Based on the evidence and argument presented at that hearing, the Court will consider whether any sanctions are warranted and if so, the scope of such, including the exclusion of witness testimony, an instruction to the jury regarding the presumption resulting from the spoliation, dismissal, or other measures.

be held on **NOVEMBER 7, 2011, at 10:30 a.m.** in Courtroom 2308. The parties are **DIRECTED** to file a consolidated pretrial order on or before **DECEMBER 7, 2011.**