[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13721
_____

D.C. Docket No. 1:12-cv-23370-JLK

AIDE SEPULVEDA TORRES,

                                                          Plaintiff-Appellant,

versus

CARNIVAL CORPORATION,
d.b.a. Carnival Cruise Lines,

                                                          Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 20, 2015)

Before MARCUS, JILL PRYOR and FAY, Circuit Judges.

PER CURIAM:

Aide Sepulveda Torres appeals summary judgment granted to Carnival Corporation in her action alleging negligence, causing her to fall and injure herself while disembarking from the *Carnival Splendor*.  We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Torres and her husband, Robert, had been passengers for a seven-day cruise on the *Carnival Splendor* out of Long Beach, California.  At the conclusion of their cruise on July 24, 2011, the couple went to a lower deck and entered a queue to complete a standard exit interview before disembarking.  Torres's husband told her to disembark, and he would "catch up."  Torres, who was wearing elevated, platform shoes, approached the security booth to disembark thereafter by a ramp.[1] After clearing the security booth, Torres tripped on the ramp as she disembarked from the ship, fell forward on her left side, and sustained a shoulder fracture.

While in line approaching the security booth, Torres testified she "didn't really pay attention" to the other passengers ahead of her, as they disembarked. She and her husband, who saw her fall, testified at their depositions there were no passengers or obstructions in the walking path between the security booth and the exit doorway; only one person at a time could traverse the area between the

---

[1] Torres wore sunglasses, but she removed them at the request of her interviewer.  Across the room, sunlight streamed through an open watertight door, over which a two-sided ramp had been placed to assist passengers in accessing the outer deck of the ship.  While there were no posted signs regarding the ramp, the carpet on the ramp was darker than the surrounding flooring.

security booth and exit doorway to the ramp to leave the ship.  Torres testified she

was not paying attention, as she walked toward the carpeted ramp in the departing

doorway:

> Q: As you approached the doorway, was there anything obstructing
> you from seeing this black carpeted area?
> A: No, sir.
> Q: Did you see the black carpeted area as you walked toward the
> doorway?
> A: Didn't even pay attention, to be truthful.  It was just like automatic.
> I just started to disembark.

The evidence is undisputed that Carnival employees, who inspected the scene

shortly after Torres's  fall, did not identify any defective condition that could have

caused her to fall.

 Malcolm Stark, the chief of security for the *Carnival Splendor*, attended to

Torres after her fall.  Stark inspected the ramp and determined it had not shifted

and there was "no damage to the carpet."  Olena Komarova, an assistant

housekeeping manager, who had inspected the area earlier that morning, observed

the outer deck was clean and dry, and the carpet on the ramp contained "no waves,

. . . [bumps or] damages."  Stark, Komarova, and an accident adjuster for Carnival

did not know of any other accidents on the threshold ramp.

Stark reviewed the surveillance recordings of the exit, but he "could not get

any footage [of the accident] because of too much glare coming through the

doors."  After Torres reported she had fallen on the downward slope of the ramp,

3

Stark and his chief assistant photographed the ramp from the outer deck. The photograph showed two yellow caution cones placed on each side of the ramp. Stark explained there was insufficient clearance to place caution cones inside the departing room, and the two-sided threshold ramp was used during disembarkment from the *Carnival Splendor* exclusively at its home port in Long Beach, California. He testified no other passenger had tripped on the two-sided threshold ramp.

Robert Torres completed a "Passenger Injury Statement" for his wife shortly after her fall, before he left the ship. He reported his wife had "walked out of [the] ship onto [the] deck, [and she] fell forward landing on [her] left side." Robert Torres attributed the accident to "[a] rise on [the] floor" or a "ramp."

Torres filed a complaint in the Southern District of Florida, based on admiralty and diversity jurisdiction,[2] and alleged Carnival was negligent for covering the threshold with "a mat or similar material, which obscured, disguised, or hid the raised threshold"; "failing to properly supervise and/or monitor the disembarkation procedure"; "failing to properly assist [Torres] as she attempted [to] disembark the ship"; and "failing to warn passengers of the hazard of which [Carnival] knew or should have known in the exercise of reasonable care and of which [it] had [superior] knowledge." Torres represented, "as she was stepping through the open passageway onto the exterior deck, . . . [she] tripped and fell over

---

[2] Torres is a resident of California; Carnival is a Panamanian corporation, with its principal base of operations in Miami-Dade County, Florida.

[the] raised threshold that had been covered over with a mat or similar material, which obscured, disguised or hid the raised threshold." She requested compensatory and "[a]ll other damages as allowable by law."

Torres testified the lighting inside and outside the ship did not affect her eyesight; she did not require assistance to walk off the ship; she saw a "rise in the floor" and a "mat" consisting of "dark carpet" in front of the exterior door; and no object or person obstructed her view of the ramp or her path to the outer deck. As she approached the doorway and not paying attention, Torres testified she suddenly "tripped, . . . stumbled" forward, reached for something to steady her, fell onto her left side, and then "slid a little bit right into the railing . . . right outside the doors," which would have kept her from going overboard. She "remember[ed] [her] left foot hitting something" and thought the accident had "[s]omething to do with [the] mat," which had an "elevation." She asserted her fall began on the inclined section of the ramp.

Robert Torres testified he "just remember[ed] . . . [his] wife falling"; after recalling she wore a "platform shoe" on the day of her accident, however, he stated "she hit something, . . . a carpet, raised carpet or device that is put there, . . . start[ed] stumbling and trying to reach for something, . . . land[ed] on her left side and slid right to the outside rail of [the] ship." Robert did not observe a defect in the carpet, when he examined the ramp shortly after his wife fell. He confirmed

5

his wife began to fall on the "[i]nterior" side of the doorway "right from possibly the beginning part to maybe a foot in."

Kevin Rider, a human-factors engineer retained by Torres, provided a report in which he opined the height of the carpet affixed to the ramp interrupted the "swing phase of [Torres's] foot" and caused her to fall. Rider prepared his report using photographs of the accident scene, Torres's statement, exemplars of new carpet obtained from three companies that produced the model of carpet affixed to the ramp, documents produced by the parties, and their answers to interrogatories. He opined Torres had tripped on "[t]he exposed edges" of the carpet because it "exceeded the maximum-1/4 requirement" for carpet thickness and for vertical changes in elevation endorsed in the 1994 Guidelines for Buildings and Facilities to the Americans with Disabilities Act ("ADA") and the standards for Accessible and Usable Buildings and Facilities issued by the American National Standards Institute.

Rider concluded Carnival could have prevented the accident, if there had been "rubber borders to provide a slope or bevel of the edge" of the carpet, as recommended in the standards created by American Society of Testing and Materials, and "effective warnings," such as "caution tape . . . [to] alert[] passengers of the trip hazard." He opined three "factors affected Torres's ability to detect and identify the raised surface of the incident doorway as a trip hazard": (1)

6

the "use of carpet to cover the threshold[, which] . . . violated [her] reasonable expectations of a flat, level and consistent walkway"; (2) "[t]he change in brightness between the interior and exterior of the doorway"; and (3) the lack of "effective warnings" on or near the flooring.

When deposed, Rider equivocated regarding what had caused Torres to fall. He testified "it's more likely than not" Torres's foot struck the front edge of the ramp because the carpet appeared in the photographs to be rounded instead of beveled. Rider conceded he had no information regarding whether the subject carpet edge was beveled or not. He also testified "it's possible that [Torres] tripped on the incline," because "the whole [ramp] is above a quarter-of-an-inch" and creates a "trip hazard." When questioned about the guidelines cited in his report, Rider acknowledged he did not "know the extent of [the] application" of the ADA guidelines to cruise ships, and the standards created by the Society of Testing were considered a "consensus standard," which was treated as "relevant for the country" by the Standards Institute. Rider was unfamiliar with the Access Board, a federal agency that advocates for accessibility for the disabled, or any of its publications about the application of the ADA to passenger vessels.

Rider did not inspect the *Carnival Splendor*, measure the threshold ramp, or consider its slope as a factor in his analysis. He testified a ramp "can be" an acceptable means of traversing a high threshold, if it is "reasonably detectable or

conspicuous to someone that's walking through on an otherwise level surface." Rider testified footwear "can be an issue in terms of walking," but he did not think Torres's platform shoes were a factor in her accident, because "research [had] show[ed] . . . that in most cases[,] . . . people . . . develop a gait pattern based on their shoes." Although Torres was not paying attention, she was "blameless" in Rider's opinion, because "the cause of [her] fall was an inconspicuous trip hazard," which was "foreseeable and predictable and supported by science of how people walk through a facility." When asked what had "prevent[ed] [Torres] from seeing the ramp," Rider answered only "the glare coming through the doorway." He conceded none of Torres's "testimony . . . relate[d] to glare being an issue," and he had "speculate[d]" from Stark's testimony about the sunlight affecting the surveillance video that the "reflective glare" in the room "inhibite[d] [Torres] from detecting floor-level hazards."

Carnival moved to exclude Rider's testimony. In granting its motion, the judge determined Rider's testimony about "floor features, lighting, and warnings" would "unnecessarily complicate[] the case." He explained Rider's testimony was not helpful, because jurors readily could "understand the simple mechanics of walking and the various reasons one [might] fall, including tripping on a carpet"; how the human eye requires "time to adjust" to changes in lighting and how "during that interval it is more difficult to see"; and whether the "placement, color,

8

size, etc. of cones" provided an adequate warning.  The judge also determined that Rider's "opinions [were] not based on a sufficiently reliable methodology," and his "lack of first-hand investigation [made] the relevance of [his] experiments quite attenuated."  The judge reasoned Rider's "methodology [was] questionable," because Rider had "never investigated the subject vessel and felt it was unnecessary to do so"; his "analysis of the carpet [was] based on comparisons of swatches exemplary"; he was unable to "quantify the differences in lighting between the interior and exterior of the ship"; and he based his analysis of the lighting "on photographs . . . even though he acknowledge[d] that [they] do not adequately depict how ambient light is seen by the human eye."

The district judge also granted Carnival's summary judgment motion, because he concluded "there [was] no genuine issue of material fact" concerning whether Carnival breached a duty to Torres, since she had failed to prove the carpet was "unreasonably dangerous."  "Given that the record evidence[d] no dispute that there was [a] hazard," Carnival also did not have a duty to warn about a latent defect.  In addition, the judge reasoned Carnival did not have a duty to warn about the "obvious hazard" created by the ramp, when Torres had testified she saw the "carpeted area and that there were no obstructions in her path."  The judge explained Torres's claims that Carnival had a duty to assist her and to supervise her disembarkation failed, because Torres had "testified that she did not

9

feel she needed any assistance in leaving the ship," and she did not submit any evidence to prove otherwise. On appeal, we determine whether the district judge properly excluded Rider's expert opinion and granted summary judgment to Carnival.

## II. DISCUSSION

### A. Expert Testimony

"We review for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion." *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc). Under Federal Rule of Evidence 702, district judges "perform the critical 'gatekeeping' function concerning the admissibility of expert *scientific* evidence," *id.* at 1260 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 n.7, 597, 113 S. Ct. 2786, 2795 n.7, 2798 (1993)), as well as "*technical* expert evidence," *id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174 (1999)). "[I]n determining the admissibility of expert testimony under Rule 702, we engage in a rigorous three-part inquiry": (1) the expert must be "qualified to testify competently" concerning the subject matter he addresses, (2) the expert's methodology must be "sufficiently reliable," and (3) the expert's testimony must "assist[] the trier of fact" in understanding scientific or technical evidence. *Id.* at 1260. "The proponent of expert testimony always bears the burden to show that

10

his expert is qualified to testify competently regarding the matters he intended to address; the methodology by which the expert reached his conclusions is sufficiently reliable; and the testimony assists the trier of fact." *Id.* (citation, internal quotation marks, and alterations omitted).  The determinations of a district judge concerning the reliability and helpfulness of expert testimony are accorded "'considerable leeway' . . . 'unless [they are] manifestly erroneous.'" *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 2312 (May 18, 2015) (quoting *Kumho Tire Co.*, 526 U.S. at 152, 119 S. Ct. at 1176; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005)).

The district judge reasonably determined Rider's conclusions were not reliable.  Rider relied on new exemplar carpets to estimate the thickness of the subject carpet; based on photographs of the ramp, he estimated its leading edge was too high from the ground and needed beveling; and the guidelines he had used to determine appropriate carpet thickness and vertical elevation governed disabled persons and land-based buildings and facilities, not cruise ships.  *See Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1180 (5th Cir. 1975) ("Evidence of custom within a particular industry, group, or organization is admissible as bearing on the standard of care in determining negligence.").  Rider could not quantify the difference in the indoor and outdoor light, and he conceded

11

the photographs on which he had based his determination did not portray the subject lighting conditions accurately. Significantly, Rider's conclusion regarding the lighting was misleading, because it was based on speculation and was irreconcilable with Torres's testimony the lighting did not affect her vision.

The judge also reasonably determined Rider's testimony would not be helpful to the jury. Rider's testimony regarding walking and the efficacy of different types of warnings can be understood easily and evaluated by jurors. *See Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266, 268 (11th Cir. 1993) (affirming exclusion of expert testimony regarding the causes of plaintiff-appellant's fall, because they were "within the common knowledge of the jurors, and thus the probative value of such testimony was outweighed by the danger of prejudice" (citing Federal Rule of Evidence 403)). Rider additionally could not assist the jury in determining what caused Torres to trip; he had disregarded Torres's admission about failing to pay attention or her representation she had tripped on the declining side of the disembarking ramp. Torres argues the problems in Rider's testimony affected its weight and persuasiveness, but the problems reveal Rider's testimony is unreliable, confusing, and unhelpful. *Cf. Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193-94 (11th Cir. 2011). The district judge appropriately granted Carnival's motion to exclude Rider's testimony.

12

**B. Summary Judgment**

We review an order granting summary judgment de novo. *Chapman*, 766 F.3d at 1312. Under Federal Rule of Civil Procedure 56(c), summary judgment is mandated against a party failing to establish the existence of an element essential to its case and on which it bears the burden of proof at trial. *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (affirming summary judgment). Summary judgment is proper when the record shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A cruise-ship owner owes an injured passenger "the duty of exercising reasonable care under the circumstances of each case." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632, 79 S. Ct. 406, 410 (1959). To prevail on her negligence complaint, Torres had to prove Carnival owed her a duty of "ordinary reasonable care under the circumstances" that it had breached by creating a dangerous condition of which it was actually or constructively aware, *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989), and of which it had failed to warn Torres under reasonable foreseeability, *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980). Aside from Rider's testimony, Torres failed to submit any evidence the carpet was hazardous. Testimony from Torres's husband, Stark, and Komarova established the carpet was not defective.

13

The undisputed evidence further established there had not been any other accidents on the threshold ramp, which would have put Carnival on notice the carpet was dangerous. *See Keefe*, 867 F.2d at 1322. Carnival could not be liable for failing to warn Torres, because "[l]iability for a failure to warn . . . arises from foreseeability, or the knowledge that particular conduct will create danger." *Daigle*, 616 F.2d at 827. Torres observed a "rise in the floor" and a "mat" consisting of "dark carpet" in her path, yet failed to pay any attention to them. Although Torres incurred injuries on a Carnival cruise ship, in the absence of any evidence to create a genuine dispute her accident was attributable to any negligence by Carnival, the district judge correctly granted summary judgment to Carnival.

**AFFIRMED.**